**UNITED STATES of America,**
**Plaintiff,**

v.

**BAY–HOUSTON TOWING**
**CO., INC., Defendant.**

No. 98–CV–73252.

United States District Court,
E.D. Michigan,
Southern Division.

March 13, 2002.

Joshua M. Levin, Andrew J. Doyle, U.S. Department of Justice, Environmental Defense Section, Washington, DC, Jacqueline S. Kline, U.S. Environmental Protection Agency, Chicago, IL, for United States of America, plaintiffs.

John H. Dudley, Jr., Butzel Long, Richard E. Rassel, Butzel, Long, Detroit, MI, Steven D. Weyhing, Kelley Cawthorne, Lansing, MI, for Bay–Houston Towing Company, Incorporated, defendants.

Geneva S. Halliday, United States Attorney's Office, Detroit, MI, Elliot Rockler, U.S. Department of Justice, Environmental Enforcement Section, Washington, DC,

## DECISION ON CIVIL PENALTIES

COHN, District Judge.

## TABLE OF CONTENTS

I. Introduction ...................................................... 790
   A. Nature of the Case ............................................. 790
   B. The Claims of the Parties ...................................... 791
   C. The Issues .................................................... 794
II. Overview of Decision on Civil Penalties ......................... 794
   A. General ....................................................... 794
   B. Summary ....................................................... 795
   C. Guiding Lines of Precedent .................................... 795
III. The Declaratory Judgment Action ................................ 796
   A. Background .................................................... 796
   B. Filing of the Declaratory Judgment Action ..................... 797
IV. Orders Prior to Trial ........................................... 798
   A. Memorandum and Order of January 14, 1999 ...................... 798
   B. Order of June 18, 1999 and Memorandum of June 22, 1999 ........ 798
   C. Corrected Memorandum and Order of March 21, 2000 .............. 799
V. Orders and Events Following Trial and Prior to Decision on Civil Penalties ...................................................... 799
   A. Summary ....................................................... 799
   B. Corps of Engineers ............................................ 800
VI. The Regulatory Scheme and the Permitting Process ............... 800
   A. The Clean Water Act ........................................... 800
   B. Code of Federal Regulations; Federal Register; Agreements ..... 801
   C. The Corps of Engineers ........................................ 803
   D. The Permitting Process in Michigan ............................ 804

VII. The Trial ..................................................... 805
   A. Overview ...................................................... 805
   B. Witnesses ..................................................... 806
   C. The Exhibits .................................................. 808
VIII. Michigan Peat's Operations in the Minden Bog ................. 808
   A. Land Acquisition .............................................. 808
   B. Peat Mining Activity .......................................... 808
IX. Penalty Decision on the NPDES (§ 402) Permit ................... 810
   A. Chronology .................................................... 810
   B. Discussion .................................................... 811
   C. Case Law ...................................................... 813
X. Penalty Decision on the § 404 Permit ............................ 814
   A. The 1991 Application .......................................... 814

B.   The 1994 Application ..................................................815
C.   Activity Subsequent to the Initial Proffer of the § 404 Permit...............819
D.   Testimony at Trial on the § 404 Issue ...................................820
E.   The Cromwell, Minnesota § 404 Permit...................................821
F.   Other § 404 Peat Mining Permits .......................................821
G.   Discussion .........................................................821
XI.  **Other Issues** .........................................................823
XII. **Conclusion** ..........................................................824
A.   Overview.........................................................824
B.   The EPA's Position on Penalties ......................................824
C.   Findings.........................................................825
D.   Final Observations .................................................826

## LIST OF EXHIBITS

A.   Layout of Minden North and South Displaying Dates of Parcel Acquisitions
B.   Layout of Minden North and South Displaying 1995 Draft Permit Categories
C.   Results of Telephone Survey on Regulatory Consistency
D.   North Display of Layout of Cells in Minden North
E.   Display of Road Construction Development in Minden North
F.   Minden Bog Typical Cross Section
G.   Display of Acreage Categories in Minden North

## I.  Introduction

### A.   Nature of the Case

This is the civil penalty phase of an environmental action brought by the United States at the request of the Environmental Protection Agency (EPA) pursuant to § 309 of the Clean Water Act (CWA), 33 U.S.C. § 1251, *et seq.* EPA seeks injunctive relief and civil penalties relating to defendant Bay–Houston Towing Company, Inc.'s Michigan Peat Division's (Michigan Peat) [1] peat mining [2] activities on 950 acres of land in Minden Township, Sanilac County, Michigan on a parcel known as Minden North, which is part of a 20,000 acre wetland known as the Minden Bog. EPA claims that Michigan Peat has discharged peat bog drainage water containing pollutants [3] through ditch outfalls into

1.   Bay–Houston and Michigan Peat are names that are used intermittently in the record. Michigan Peat refers to the defendant Bay–Houston Towing Company, Inc.

2.   There is no single word which defines a commercial peat operation. In the record the activity has been variously referred to as harvesting, mining, extracting and excavating. For consistency's sake, the activity will be referred to in this decision as mining. *See* W. Cwikiel, *Rethinking Peat Mining,* the National Wetlands Newsletter, May/June 2000, available at www.eli.org/publications/nwn/nwnarchive/22–03articles. The preference for "harvesting" as opposed to "mining" implies production of a "restorable and regrowable crop." For a general discussion of peat mining, see the International Peat Society's internet website located at http://www.peatsociety.fi.

3.   A "pollutant" is defined as:
dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, muni-tions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. This term does not mean (A) "sewage from vessels or a discharge incidental to the normal operation of a vessel of the Armed Forces" within the meaning of section 1322 of this title; or (B) water, gas, or other material which is injected into a well to facilitate production of oil or gas, or water derived in association with oil or gas production and disposed of in a well, if the well used either to facilitate production or for disposal purposes is approved by authority of the State in which the well is located, and if such State determines that such injection or disposal will not result in the degradation of ground or surface water resources.
33   U.S.C. § 1362(a)(6).
The term "discharge of a pollutant" and the term "discharge of pollutants" each means:

the Black River Drain without a permit under § 402 of the CWA (Count I); discharged dredged or fill material into wetlands without a permit under § 404 of the CWA (Count II); and violated an administrative compliance order issued by EPA under § 309 of the CWA, requiring, among other things, that Michigan Peat cease unpermitted discharges and submit a wetlands restoration plan (Count III). EPA seeks to impose a three million dollar civil penalty against Michigan Peat.

For the reasons which follow, which constitute the findings of fact and conclusions of law as required by Fed.R.Civ.P. 52, no civil penalty will be assessed.

### B. The Claims of the Parties

#### 1.

##### a.

The Joint Final Pretrial Order filed March 5, 2001, generally describes the claims of the parties as follows:

EPA:

1. From 1977 to the present, in its peat mining [Michigan Peat] has discharged pollutants into waters of the United States in violation of § 301 and § 404 by
   a. placing field windrows (or piles) of peat at Minden Bog without a permit;
   b. placing peat and other materials, dredged and removed from drainage ditches on Minden Bog without a permit; and
   c. placing fill materials on Minden Bog, for the purpose of constructing and/or maintaining roads for moving mining equipment without a permit.
2. Michigan Peat has discharged pollutants into the waters of the United States in violation of § 301 and § 402 by
   a. discharging effluent waste water without an individual National Pollution Discharge Elimination System (NPDES) permit prior to July 1998.
3. Michigan Peat has violated § 309 by failing to observe the requirements of a February 1998 administrative compliance order that it "immediately cease further discharges" of dredged and fill material, except in compliance with a permit issued under § 404.

As to remedy:

EPA is entitled to injunctive relief and a civil penalty for Michigan Peat's violations of the CWA. By way of injunctive relief, EPA is entitled to an order requiring Michigan Peat to implement and observe a restoration plan intended (except as otherwise agreed upon by EPA to reestablish peatland conditions at Minden North), in such a way that natural succession will eventually reproduce the objective ombrotrophic bog that previously existed in the mined area of Minden Bog. As for a penalty the CWA authorizes a maximum penalty of $25,000 per day per violation. For violations which take place after January 30, 1997, the maximum civil penalty under § 309(d) is $27,500 per day. The factors the Court should take into account in assessing a penalty are set forth in § 1319(b). The factors the Court should take into account in approving an appropriate restoration plan are whether: (1) the plan will confer maximum environmental benefits; (2) the proposed plan is achievable as a practical matter; and (3) he proposed plan bears an equitable re-

---

(A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft.

33 U.S.C. § 1362(a)(12).

lationship to the degree and kind of wrong it is intended to remedy.

### b.

Michigan Peat:

1. Its peat extraction operations were initially covered by nationwide permit 26 as adjacent to headwaters. As to its drainage ditch and temporary haul roads, they were installed prior to any permit required under § 404 or were covered by nationwide permit 26. In any event, the construction and maintenance of the existing temporary haul roads was and is exempt from a § 404 permit requirement. The maintenance of existing ditches is also exempt.

2. Its storm water management drains do not require an individual § 402 permit and its peat operations do not result in the generation of any process wastewater or the addition of a pollutant to any navigable water of the United States. It received timely coverage of its storm water discharge under § 402 in 1994. At the request of the State of Michigan, the issuing agency for § 402 permits, it also applied for an individual point source § 402 permit early in 1995. Although the permit process was intentionally frozen by the issuing agency in 1997 for no environmental reason, it ultimately received a permit in July of 1998—shortly after the filing of the complaint.

3. It complied in 1998 with the part of the compliance order requiring it to cease operations and only resumed operations in 1999 after the receipt of the Sixth Circuit's decision in *Michigan Peat v. U.S. E.P.A.*, 175 F.3d 422 (6th Cir.1999).

4. Since 1990, it has made a good faith effort to obtain permits identified by the government agencies as necessary for its peat mining operation. Even if its maintenance of ditches and roads or the processing of peat in windrows constitute technical violations of § 404, no penalty is warranted or appropriate. Any material in windrows or removed from ditches has been removed from the property.

5. In light of the Supreme Court's decision in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (*SWANCC*), the Minden North site is not subject to the jurisdiction of § 404.

### 2.

### a.

More particularly, EPA asserts:

— Michigan Peat systematically collected channeled surface water runoff and peat bog drainage water into the Black River Drain and hence into the Black River and then to Lake Huron (into the waters of the United States) without an NPDES permit as required by § 402 beginning in 1972.

— Michigan Peat had no authority under federal law to discharge dredged or fill material on any portion of the wetlands constituting the Minden Bog without a valid permit under § 404. Michigan Peat's long term peat mining on the 951 acres it owned or controlled in the Minden Bog was unlawful particularly because it proposed post-mining reclamation/restoration plans required by § 404 to the State of Michigan in bad faith. Michigan Peat systematically and persistently took measures to avoid reclamation of the wetlands it was mining peat from after assuring the State of Michigan, and EPA, of its intention to devise such plans.

— Michigan Peat received a *bona fide* administrative compliance order from EPA in February 1998 and has failed to comply with it.

— for peat mining without a valid NPDES permit until 1998 and without a valid § 404 permit, Michigan Peat should suffer a civil penalty of three million dollars.

— Michigan Peat should be required to reclaim and restore depleted wetlands.

### b.

More particularly, Michigan Peat asserts:

— Michigan Peat's predecessor in interest began mining peat in Minden Bog in 1958 after purchasing land from the State of Michigan for this express purpose. Michigan Peat beginning mining peat in Minden Bog in 1964 after leasing the land from its predecessor. Mining peat by Michigan Peat and its predecessor in Minden Bog has been continuous since 1958.

— Its activities for the five years preceding the filing of suit by EPA and longer, have been conducted under circumstances where an application for a required § 404 permit was pending and, after withdrawal of State of Michigan authority, under a colorable claim that it had a State of Michigan permit. Only after January 12, 2001 did it no longer have a colorable claim to a § 404 permit.

— At all times during the five years preceding the filing of suit by EPA it had pending an application for a § 402 permit and within six months following the issuance of the administrative order it received a § 402 permit.

— As to its conduct following issuance of the administrative order to cease mining peat and the filing of suit, at no time, although invited to do so, did EPA ask the Court to stop peat mining on the grounds of irreparable injury.

### 3.

Michigan Peat does not dispute its obligation to do something about the mined areas (sometimes referred to as depleted or exhausted) and to conduct its peat mining activities with a view to some form of reclamation/restoration in the future. The crux of the dispute between EPA and Michigan Peat lies in what is to be done with the mined portions of the 950 acres and what is to be done with the balance of the 950 acres once peat mining ceases or as to portions on which peat mining ceases in the course of future mining. The fact that Michigan Peat owns 2000 acres of Minden Bog for which it apparently it cannot obtain a permit to mine peat at this time is not an issue in this case, but certainly is likely to be an issue sometime in the future if EPA, the State of Michigan, and Michigan Peat do not come to agreement on the use of these acres.

### 4.

In its 1994 permit application to the State of Michigan, discussed in detail below, Michigan Peat presented a plan to return mined areas to a wetland state containing large bodies of open water. This is called reclamation. EPA, however, takes the position that mined areas should be restored to the extent practicable to a bog like condition. This is called restoration. The differences between reclamation and restoration involve two forms of expenses: the diminishment of the amount of peat available for mining and additional costs in operations. More particularly:

Reclamation, also called "out-of-kind" wetland reclamation, occurs when one type of wetland, with particular environmental and ecological functions and val-

ues, is replaced through human intervention with a different type of wetland; the different type of wetland provides or will provide, in part or in whole, different functions and values than was provided by the original wetland.

Restoration, also call "in-kind restoration", occurs when a wetland which has been damaged or destroyed is rehabilitated or re-created as the same type, or a similar type, of wetland. When restoration occurs, the same ecological functions and values (*e.g.* habitat for specific bird, mammal and insect species, carbon storage, hydrological functions, etc.) of the original wetland are again provided by the new, restored wetland.[4]

Restoration is a relatively new approach to treatment of mined peat areas. Historically, mined peat areas have been reclaimed, if at all.

### C.  The Issues

The *Corrected Memorandum And Order Granting In Part And Denying In Part Plaintiff's Motion For Summary Judgment*, filed March 21, 2000, describes the issues for trial as follows:

*Section 404*

1.  Whether the 749 acres[5] required a permit and whether Bay–Houston's activities prior to 1984 were covered by a NWP 26 permit;

2.  Whether the ditch and road exemptions under Section 404(j) apply (the reference should have been to Section 404(f)(1)(E) as to haul roads and Section 404(f)(1)(B) as to drainage ditches);

*Section 402*

1.  Whether Bay–Houston's activities constitute an "addition" to water; and

2.  Whether Bay–Houston's activities fall within the Section 402 exemption for storm water runoff.

*Section 309(a)*

1.  Whether Bay–Houston complied with the part of the compliance order requiring it to ease operations.

Additional issues at trial included reclamation/restoration appropriate to injunctive relief, and the amount of the civil penalty, if any, to be assessed for operating in the absence of the required permits and in violation of the compliance order. The issue of "adjacency," as will be later described, was also part of the trial. As will be discussed, however, the issues for decision turned out to be significantly different.

### II.  Overview of Decision on Civil Penalty

#### A.  General

The main issue for decision at this time is the amount, if any, of the civil penalty to be assessed against Michigan Peat for operating without a § 402 permit until July 24, 1998 and for operating without a § 404 permit from 1972 to date. In determining the appropriate penalty, two syllogisms come to mind:

Peat is a commercially useful product (organic soil used for horticultural purposes). Peat is found only in peat bogs. Therefore mining a peat bog is a legitimate commercial activity.

Peat mining is a legitimate commercial activity. To mine peat ditches must

---

**4.**  *See also An Introduction to Wetland Restoration, Creation and Enhancement*, a multi-federal agency guide available at www.epa.gov/owow/wetlands/draftintro.html, and an EPA paper entitled *River Corridor and Wetland Restoration*, found at www.epa.gov/owow/wetlands/restore/defs.html.

**5.**  This is the portion of Minden North which the State of Michigan said were "grandfathered" and did not require a § 404 permit, as will be described later. *See* Part III, *infra*.

be dug to drain off surface waters and haul roads constructed to move equipment and peat. Therefore the digging of drainage ditches and construction of haul roads is a legitimate activity as part of a peat mining activity.

### B. Summary

The record does not support a penalty for Michigan Peat's peat mining activity in the absence of an NPDES permit. As will be described, as soon as Michigan Peat was notified by the permitting authority, Michigan's Department of Natural Resources (DNR), it filed for, and diligently pursued, a permit. At no time did bog water drainage into the Black River Drain do any substantive harm to the environment. The compliance order requiring Michigan Peat to cease peat mining without an NPDES permit and the filing of this case to enforce the compliance order were neither necessary or appropriate to the circumstances.

The record also does not support a penalty for Michigan Peat's peat mining activity in the absence of a § 404 permit. Again, as soon as Michigan Peat was notified by the permitting authority that it needed a permit, it filed for and pursued obtaining one. While admittedly Michigan Peat could have been more aggressive in pursuing the permit, at no time did the DNR, or EPA, tell Michigan Peat to cease its peat mining activities. Following the issuance of the compliance order and the filing of this case, Michigan Peat suspended operation and resumed peat mining only after the Court functionally placed an "umbrella" over its peat mining activities.

### C. Guiding Lines of Precedents

In coming to its decision, the Court is mindful of three lines of precedential authority which support the finding that no penalty is in order against Michigan Peat for mining peat from the time of enactment of the CWA to July 24, 1998 without a NPDES permit, and without a § 404 permit to the present time.

The first line are the cases which hold that where a regulation fails to give fair warning of the conduct it prohibits a person cannot be penalized for violating the regulation. Here, as will be discussed, EPA and the Corps of Engineers did not make clear that until the early 1990's peat mining constituted a "discharge" under § 404 and that an NPDES permit was required for Michigan Peat's mining peat in the Minden Bog.

Exemplary of these cases are: *Gates & Fox Company, Inc. v. O.S.H.A.,* 790 F.2d 154, 155 (D.C.Cir.1986) ("Where the imposition of penal sanction is at issue ... the due process clause prevents that deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires"); *Satellite Broadcasting Co. v. F.C.C.,* 824 F.2d 1 (D.C.Cir.1987) (same); *Rollins Environmental Services v. U.S. E.P.A.* 937 F.2d 649, 654 (D.C.Cir.1991) ("While we defer to EPA's interpretation of the rule, the lack of adequate notice resulting from the regulations inherent uncertainty in meaning is a mitigating factor that had to be taken into account in assessing the civil penalty"). *See also* Kenneth K. Kilbert and Christian J. Helbling, *Interpreting Regulations In Environment Enforcement Cases: Where Agency Deference And Fair Notice Collide,* 17 Va. Envtl. L.J. 449 (Summer 1998).

The more relevant and cogent line are the cases which hold that injunctive relief is not appropriate under traditional equitable principles even though the activity is being carried out either in the absence of a permit or while an application is pending. For instance, in *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312–13, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), the Supreme Court said:

In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *Railroad Comm'n. v. Pullman Co.*, 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941). Thus, the Court has noted that "[t]he award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," and that "where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Yakus v. United States, supra,* 321 U.S. [414,] 440, 64 S.Ct. [660]. 675[, 88 L.Ed. 834](footnote omitted). The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law. *TVA v. Hill,* 437 U.S. [153,] 193, 98 S.Ct. [2279,] 2301[, 57 L.Ed.2d 117]; *Hecht Co. v. Bowles,* 321 U.S. [321], 329, 64 S.Ct. [587], 591[, 88 L.Ed. 754].

*See also Amoco Production Company v. Village of Gambell, Alaska, et al,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) ("We acknowledged in *Romero–Barcelo* the important role of the 'public interest' in the 'exercise of equitable discretion.'"); *Natural Resources Defense Council, Inc. v. Texaco Refining And Marketing Inc.,* 906 F.2d 934, 938 (3d Cir. 1990) (... "in *Romero–Barcelo* the [Supreme] Court found nothing in the Clean Water Act's language structure or legislative history evidencing Congress' intent to deny courts their traditional equitable discretion.")

Finally, there is the line of cases which recognize that civil penalties may be considered "quasi criminal" in nature. *See First American Bank of Virginia v. Dole,* 763 F.2d 644, n. 6 (4th Cir.1985); *Pollgreen v. Morris,* 579 F.Supp. 711, 717–18 (S.D.Fla.1984); *United States v. Sanchez,* 520 F.Supp. 1038, 1040 (S.D.Fla.1981).

## III. The Declaratory Judgment Action

### A. Background

In reaching its decision that no civil penalty is warranted, The Court began by considering Michigan Peat's conduct in filing the declaratory judgment action Michigan Peat brought shortly before, and obviously in anticipation of, EPA's withdrawal of the State of Michigan's authority to act on Michigan Peat's § 404 application to mine peat in the Minden Bog,[6] as will be discussed. *See* Part X. *infra.*

As an initial matter, the authority to issue § 404 permits under the CWA was originally vested in the DNR by agreement between EPA and the State of Michigan. Any permit, however, was subject to EPA approval. EPA could withdraw the DEQ permitting authority and vest it in the Secretary of the Army operating through the Corps of Engineers if dissatisfied with a DNR draft permit, as EPA did here.

In 1991, Michigan Peat applied for a § 404 permit with the DNR for the 2,800 acres of land it owned or leased in Minden Bog. The 2,800 acres was in two separate parcels: Minden North and Minden South. Exhibit A displays the two parcels and the

---

6. Permitting by the State of Michigan was initially done through the DNR. In 1997 this authorization was transferred to the Department of Environmental Quality (DEQ). The terms, State, DNR, and DEQ are used interchangeably in this decision.

dates of acquisition by Michigan Peat. Four yeas later, in 1995, the DNR proffered Michigan Peat a § 404 permit covering only 950 acres of peat land in Minden North. The proffered permit stated 749 acres were "grandfathered" and did not need a permit. Exhibit B displays the sub-parcels in the 1995 proffered permit; it shows the 749 "grandfathered" acres, the 202 permitted acres, and the 1049 acres for which a permit was denied. Shortly thereafter, as will be discussed, the EPA withdrew the State of Michigan's permitting authority.

### B. Filing of the Declaratory Judgment Action

On May 16, 1997, Michigan Peat filed a declaratory judgment action, which it amended on June 25, 1997, seeking to (1) enjoin the EPA from withdrawing the permitting authority of the DNR, (2) validate its right to mine peat from the 749 acres in Minden North "grandfathered" without a § 404 permit, (3) validate its right to continue mining peat on 202 acres in Minden North for which the DNR had proffered a permit. At the same time Michigan Peat contested the conditions of the proffered permit under Michigan's Administrative Procedures Act, Mich. Comp. Laws Ann. § 24.201, *et seq.*, and also instituted a taking action in the Michigan Court of Claims.

The Court dismissed the action on the grounds no final EPA action was involved and, therefore, the Court lacked jurisdiction. *Michigan Peat v. Regional Administrator of Region V of U.S. E.P.A,* 7 F.Supp.2d 896 (E.D.Mich.1998). Michigan Peat appealed. The Court of Appeals for the Sixth Circuit held that EPA's approval of the draft permit was final agency action subject to review and reversed the dismissal. *Michigan Peat v. U.S. E.P.A.,* 175 F.3d 422 (6th Cir.1999).

On remand, in the *Memorandum And Order Denying Plaintiff's Motion For Partial Summary Judgment As To Count I And Granting In Part And Denying In Part Defendant's Cross Motion For Summary Judgment As to Count I,* filed January 24, 2000, the Court dismissed all of Michigan Peat's claims except the claim that the 749 acres was grandfathered. This claim, the Court held, presented a triable issue of fact. In a *Memorandum* filed January 12, 2001, the Court held that the 749 acres were not grandfathered and dismissed the case. Michigan Peat appealed.

In an unreported *per curiam* decision, the Sixth Circuit affirmed the dismissal, stating:

> We explained the complicated factual, statutory, and procedural history of this case in *Michigan Peat v. U.S.E.P.A.,* 175 F.3d 422 (6th Cir.1999) (*Michigan Peat* I). On remand from that decision, the district court granted summary judgment to the Environmental Protection Agency, concluding that the Agency's withdrawal of its objections to the draft permit was not a final and binding determination that 749 acres of wetlands owned by Michigan Peat are exempt from certain provisions of the Clean Water Act. The district court determined that the 749 acres currently are not exempt and that Michigan Peat does not hold a state license to mine peat. We have reviewed the reasoning of the district court and now AFFIRM.

*Michigan Peat v. U.S. E.P.A.,* 2001 WL 1136082, *1 (6th Cir. Sept.18, 2001) (footnote omitted).

The almost summary affirmance of the Court's dismissal of Michigan Peat's claim that the 749 acres were grandfathered, that it did not have a valid permit to mine the 202 acres, and that it did not have right to administrative review of the conditions in the proffered permit clearly confirmed the Court's initial view that the declaratory judgment action had no merit.

However, the Sixth's Circuit reversal of the Court's initial dismissal did give Michigan Peat a colorable claim that its peat mining was lawful. What is particularly regrettable about all this is Michigan Peat's failure to appreciate EPA's role in the 404 permitting process. Simply put, the DNR could not issue a § 404 permit without EPA approval and resort to the State administrative appeal process was a futile effort.

### IV. Orders Prior To Trial

The Court's orders in this case prior to trial are also important to an understanding of the Court's decision here.

### A. Memorandum And Order Denying Defendant's Motion For Summary Judgment of January 14, 1999

On January 14, 1999, the Court denied Michigan Peat's motion for summary judgment. In this decision, the Court declined to dismiss Count I of the complaint (discharging pollutants via peat bog drainage without an NPDES permit) even though a NPDES permit had been issued to Michigan Peat on July 24, 1998. The Court held that it was necessary to review Michigan Peat's compliance with the conditions of the permit, limited to specific violations of the permit identified by EPA within 60 days from the date of the order. No violations were, or have been, identified. This order did not moot the need for the Court to consider EPA's claim that a civil penalty should be assessed for peat mining without an NPDES permit prior to July 24, 1998.

As to EPA's § 404 claim, after describing the background of the matter including peat mining, permitting activity, the regulatory scheme and Michigan Peat's defenses, the Court held that:

— spreading side-casted bog material from the sides of a ditch onto the bog for future harvest constituted an "addi-

tion" under § 404 and therefore subject to a permit.

— the mining of peat land, since it entails deliberately displacing bog material could constitute a regulatable "discharge."

— bog material temporarily displaced before being removed could constitute a "discharge" and that this might not be negated by ultimate removal of the redeposited material (windrows).

— whether the haul roads were temporary and hence exempt from regulation presented an issue of fact.

— the use of indigenous bog vegetation and clay to treat haul roads and windrow foundations could constitute the discharge of "fill materials" under § 404.

In a concluding footnote the Court expressed the naive view that in light of the fact that Michigan Peat had been issued a § 404 in Cromwell, Minnesota to mine peat [7] "the parties should be able to agree on a form of a section 404 permit which will allow Bay–Houston to continue its peat harvesting operations in Minden North." *U.S v. Bay–Houston Towing*, 33 F.Supp.2d 596, 608 n. 12 (E.D.Mich.1999).

### B. Order of June 18, 1999 and Memorandum of June 22, 1999

In these orders, the Court denied Michigan Peat's application for a preliminary injunction against enforcement activity by EPA to enable it to go forward with the 1999 harvesting season. The Memorandum of June 22, 1999 states:

Defendant has not established irreparable harm. There is nothing in the record to suggest that plaintiff has, or will, move for preliminary relief to halt the 1999 harvesting season provided defendant continues such harvesting season under the terms and conditions dis-

---

**7.** *See* Part X.E, *infra.*

cussed with plaintiff, and which plaintiff has apparently acknowledged would not cause irreparable harm to the harvested areas, i.e., appropriate restoration and reclamation would be possible. Should circumstances change, defendant may renew its motion to establish the presence of the four conditions traditionally present when a preliminary injunction is in place. As of now, the possibility that plaintiff, at some future time, may argue for a penalty for the 1999 harvesting activities on grounds that they were conducted in violation of the Act, notwithstanding the fact that permits have been requested and are being processed and the activities were continued under terms and conditions which did no irreparable harm to the harvested areas, does not warrant preliminary relief. Defendant has conducted seasonal harvesting activities in Minden Township since 1957 and in Sandusky Township since 1967. Because of the complexities of permit requirements, sound administrative practices suggest that historic harvesting activities should not have to be suspended while permit applications are being processed, provided no irreparable harm is being done to harvested areas. *See Weinberger v. Romero–Barcelo,* 456 U.S. 305, 320, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

C. Corrected Memorandum And Order Granting In Part And Denying In Part Plaintiff's Motion For Summary Judgment of March 21, 2000

On March 21, 2000, the Court granted EPA's motion for summary judgment in part. As to the § 404 issues, the Court:
— found that Michigan Peat violated 404 by placing fill and dredged material in the waters of the United States when it added pollutants by the movement of organic soil, vegetable clay, and other plant material.

— found that the Minden Bog was not an isolated wetland. (the adjacency issue).

— defined the issues which required resolution by trial

## V. Orders and Events Following Trial and Prior to Decision On Civil Penalties

### A. Summary

#### 1.

Following completion of the proofs on all but the adjacency issue, on March 20, 2001, the Court ruled that EPA was entitled to a judgment on the three counts of the complaint. *See* Trial Transcript Vol. VI at p. 236. Following telephone conference calls on March 28, 2001 and April 4, 2001, the Court entered an *Interim Order* on May 11, 2001
— enjoining Michigan Peat from continuing peat mining at Minden North until the Corps of Engineers issued a permit
— requiring implementation of out-of-kind reclamation on certain mined portions of Minden North
— allowing continued peat mining on certain portions of Minden North under defined conditions
— required that a bond or letter of credit be posted to secure the required reclamation obligations

On June 18, 2001, the Court entered a *Corrected Order* setting forth the basic issues for final decision as follows:
1. The injunctive relief to be afforded EPA as a consequence of Michigan Peat's peat mining without appropriate permits under the CWA;
2. The penalty to be imposed on Michigan Peat as a consequence of its mining peat without appropriate CWA permits;

3. Michigan Peat's claim that its peat mining activities were not subject to the CWA because Minden North lands are not adjacent to waters of the United States.

On July 9, 2001, the Court entered an *Order* following receipt of written comments solicited from the Corps of Engineers modifying the Interim Order with regard to the mining of particular portions of Minden North.

On August 8, 2001, Michigan Peat asked the Court to refrain from issuing any decision regarding the adjacency issue until the Corps of Engineers permitting process was completed.

On September 5, 2001, the Court entered an *Order* staying proceedings on the adjacency issue.

On October 16, 2001, the Court entered an *Order* noting that it deferred briefing and decision on the appropriate injunctive relief pending completion of the permitting process with the Corps of Engineers and stating that it intended to proceed to a final decision on the appropriate penalty.

2.

Effectively, the Court found that Michigan Peat's peat mining activities in Minden North required a § 404 permit, but stayed injunctive relief under defined conditions pending completion of the Corps of Engineers permitting process which includes specific reclamation/restoration requirements,[8] and stayed a decision on the adjacency issue until such time as it became necessary to decide it. If Michigan Peat and the Corps of Engineers agree on a § 404 permit, the adjacency issue will be moot.

### B. Corps of Engineers

As will be described, on December 17, 1998, at the suggestion of the Court, Michigan Peat filled a § 404 permit application with the Corps of Engineers. On January 10, 2002, the Corps of Engineers proffered a § 404 permit to Michigan Peat. Resolution of the differences, if any, between the Corps of Engineers and Michigan Peat as to appropriate conditions for the permit are in the future. As with the authority of the DNR to issue a § 402 permit, EPA approval is also required for a Corps of Engineers § 404 permit. However, if EPA does not agree with the Corps of Engineers' proffered permit, the "disapproval" process is rather complicated. *See* 40 C.F.R. Pt. 231.

### VI. The Regulatory Scheme and the Permitting Process

Also important to an understanding of the Court's decision is the complicated regulatory schemes under the CWA for a NPDES permit and for a § 404 permit as well as the permitting process. This scheme was discussed by the Court in a prior decision. *United States v. Bay–Houston Towing,* 33 F.Supp.2d 596 (E.D.Mich.1999). A further description follows.

### A. The Clean Water Act

The regulatory scheme under the CWA is generally as follows:

1.

— The stated purpose of the CWA is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters (§ 101(a)).

— The Administrator of the EPA administers the Act generally (§ 101(d)).

— Except as in compliance with the Act, the discharge of any pollutant is unlawful (§ 301(a)).

— If the Administrator finds a violation of the Act, he is to issue an order

---

**8.** The Corps of Engineers permitting process is described at http://www.elye.usace.army.mil/unctions/rflhtml/mitmon.html.

requiring compliance or may bring a civil action and may ask for an injunction (§ 301(b)).

— Any person who violates the Act is subject to a civil penalty (§ 301(d)).

— The factors to be considered in assessing a civil penalty (§ 301(d)) are

— the seriousness of the violations

— the economic benefits, if any, resulting from the violations

— the history of violations

— the good-faith efforts to comply

— the economic impact of the penalty

— such other matters as justice may require

— There is a five year statute of limitations on civil penalties (28 U.S.C. § 2462)

### 2.

— A permit is required for the discharge of any pollutant (§ 402(a))

— A state may issue, under defined circumstances, § 402 permits (§ 402(b))

— The Secretary of the Army, through the Corps of Engineers, may issue a permit for the discharge of dredged or fill material (§ 404(a))

— A State may issue § 404 permits under defined conditions (§ 404(a)) [9]

— As to a § 404 permit, a state issued-permit is subject to the approval of the Administrator and such authority to issue may be withdrawn in which event authority to issue a permit is vested in the Secretary of the Army. (404(g) and (h)) acting through the Corps of Engineers

— The EPA may veto a Corps of Engineers approved permit (§ 404(c))

— the discharge of dredged or fill material for the purpose of maintenance of drainage ditches does not require a permit (§ 404(j)(1)(c))

— the construction or maintenance of temporary roads for moving mining equipment under defined conditions does not require a permit (§ 404(d)(1)(E))

— The terms "pollutant," "discharge of a pollutant," "point source" and "pollutes" are each defined terms (§ 502).

### B. Code Of Federal Regulations; Federal Register; Agreements

### 1.

The § 402 regulatory scheme may be briefly described as follows:

— On August 8, 1973, the EPA published notice of the request of the State of Michigan to administer the NPDES program in the state. 38 Fed.Reg. No. 152.

— In September 1973, EPA and the State of Michigan entered into an agreement providing for State of Michigan administration of the NPDES program in Michigan.

— On July 16, 1974, EPA published notice of its approval of the request of the State of Michigan to administer the NPDES program in 39 Fed.Reg. No. 137, at 26061.

— On March 28, 1997, EPA published notice of its intention to approve modification of the NPDES program in Michigan in transferring authority from DNR to DEQ. 62 Fed.Reg. 14844

— On November 14, 1997, EPA approved the modification. 62 Fed.Reg. 61170.

---

9. Except for Michigan and New Jersey, initial authority for issuance for a § 404 permit is in the Corps of Engineers.

— 40 C.F.R. Pt. 123 describes the requirement of a state approved NPDES program including:

— § 123.25: requirements for permitting

— § 123.26: requirements for compliance evaluations

— § 123.27: requirements for enforcement authority

— § 123.30: requirements for judicial review for final approval or denial of NPDES permit in state courts

— § 123.41: sharing of information (relating to transmission by the State to EPA of application)

— § 123.44: EPA review of, and objection to, a State permit

The § 402 regulatory scheme gives the State of Michigan comprehensive authority to issue and enforce NPDES permits while giving EPA oversight authority clearly makes the State the primary actor.

2.

The § 404 regulatory scheme may be described briefly as follows:

— 33 C.F.R. Pt. 323: particular policies and practices of the Corps of Engineers in reviewing applications for a § 404 permit.

— 33 C.F.R. Pt. 326: enforcement policies of the Corps of Engineers, including particularly

— § 326.3(e)(IV): which provides that the processing of an application will be suspended during the time an enforcement action is pending.

— 40 C.F.R. Pt. 230, Appendix A: Guidelines For Specification of Disposal Sites for Dredged or Fill Material (§ 404(b)(1) guidelines), which include

— § 230.41: particular provisions relating to wetlands

— § 230.75: actions to minimize adverse effects on actions affecting plant and animal population, including reclamation/restoration.

— 40 C.F.R. Pt. 231: proceedings required by EPA in exercising authority to veto a Corps of Engineers approved permit

— 40 C.F.R. Pt. 233: regulations regarding state programs administering § 404 permitting, including

— § 233.34: permitting decision by the State authorized person, including a written determination outlining the decision and rationale for a decision on a permit application.

— § 233.50–53: EPA oversight and review of state permitting decisions, including the following:

— (J) In the event that the [State] neither satisfies EPA's objections or requirements for a permit condition nor denies the permit, the Secretary shall process the permit application.

— § 233.70: approval of the State of Michigan to issue 404 permits.

3.

Additionally, because of the joint authority of EPA and the Corps of Engineers regarding § 404 permits, there are a number of agreements between them relating to enforcement and implementation of the § 404(b)(1) guidelines particularly with regard to mitigation. *See* Memorandum of Agreement Between the United States Environmental Protections Agency and the Department of the Army Concerning the Determination of Mitigation under the Clean Water Act Section 404(b)(1) Guidelines, dated February 6, 1990. *See also Bersani v. U.S. E.P.A,* 674 F.Supp. 405 (N.D.N.Y.1987), *aff'd* 850 F.2d 36 (2d Cir. 1988) (describing the relationship between EPA and the Corps of Engineers regarding § 404 matters).

### C. The Corps of Engineers

#### 1.

Under the Corps of Engineers the permitting process is as follows:

1. Application is made to the district office for Michigan.
2. The office reviews the application to determine whether it is administratively complete and may request additional information.
3. Upon determination that the information is complete a public notice is given, which provides for a comment period, usually 30 days.
4. Following the close of the public comment period, a permit decision is made.
5. If the applicant is dissatisfied with the decision it may file an internal appeal with the Corps.
6. A dissatisfied applicant may obtain review in the district court under the Administrative Procedure Act, 5 U.S.C. § 551.

#### 2.

In denying Michigan Peat's motion for summary judgment, and in granting EPA summary judgment in part, the Court discussed the regulatory scheme and its application to Michigan Peat's peat mining activity as regulateable by § 404. These discussions will not be repeated here. What the Court failed to discuss was the particular application of the definition of "discharge of dredged material" to peat mining under the Corps of Engineers regulations, which will now be addressed.

July 18, 1990, the Corps of Engineers issued a Regulatory Guidance Letter, NO. 90–5 (Dx 149) interpreting "discharge of a pollutant" under § 502(12) and 33 C.F.R. § 327.2(f) to include

> ... land clearing activities using mechanized equipment such as back hoes or bulldozer ... [to] constitute point source

discharges [which] are subject to section 404 jurisdiction when they take place in wetlands which are waters of the United States.

33 C.F.R. 323.2(d)(1) reads in part:

> (d)(1) Except as provided below in paragraph (d)(2), the term discharge of dredged material means any addition of dredged material into, including any redeposit of dredged material within, the waters of the United States. The term includes, but is not limited to, the following:
>
> (i) the addition of dredged material to a specified discharge site located in waters of the United States;
>
> (ii) the runoff or overflow from a contained land or water disposal area;
>
> and
>
> (iii) any addition, including any redeposit, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation.

This definition was adopted in an amendment noticed in 58 Fed.Reg. 45,008 on August 25, 1993. In discussing the amendment, the Corps of Engineers stated:

> Based upon public comments, the agencies have made certain changes to the language in the regulation defining "discharge of dredged material." However, the basic thrust of the proposal had not changed. Under the final rule, any addition or redeposition of dredged material associated with any activity, including mechanized landclearing, ditching, channelization and other excavation, that destroys or degrades waters of the United States requires a Section 404 permit.

58 Fed.Reg. 45,009 at 45, 009 (Aug. 25, 1993).

On September 17, 1993, the St. Paul District of the Corps of Engineers [10] published a Public Notice that the § 404 permit regulations defining discharges of dredged material had been amended, referencing 58 Fed.Reg. 45,008. The Notice stated in part:

> Mechanized lands clearing, ditching, channelization, and other excavation activities that destroy or degrade waters of the United States, including wetlands, require a Section 404 permit under the Clean Water Act.

A Second Notice to that effect was published by the St. Paul District on May 24, 1994. This Notice stated in part:

> The additional, ongoing activities that are now regulated by the Corps under the amended regulations generally include, but are not limited to, mining (peat, gravel, etc.) activities in wetland/water areas.[11]

As part of the rule making process reflected in the Public Notices discussed above, the Corps of Engineers did a telephone survey of its regulatory activity to determine "whether some Corps of Engineers district offices were already regulating certain activities in a manner consistent with the proposed final excavation rule." Particularly:

> 2. We asked these Branch Chiefs whether they felt that their current regulatory programs were consistent with the rule of whether they believed that they would have to make changes in their programs during implementation of the rule. We asked them to answer

this question with respect to landclearing, ditching, channelization, and mining activities conducted in the waters of the United States.

The results of the survey are displayed in Exhibit C.

### D. The Permitting Process In Michigan [12]

It is not necessary to detail the permitting process in Michigan with regard to issuance of a NPDES permit. The discussion of Michigan Peat's application, *infra,* is sufficient for the decision here that a penalty is not appropriate. However, a discussion of the permitting process involved in Michigan Peat's § 404 application is important to the decision here that a penalty is not appropriate. That process has been described in prior orders in this case and is generally as follows:

1. The applicant files an application with the Director of the DEQ.

2. Once the application is deemed complete, the DEQ issues a public notice announcing the opportunity to request a public hearing.

   a. The minimum time for the public notice is 30 days during which interested parties may express their views concerning the application.

   b. Any interested person may request a public hearing, which will be held at the DEQ's discretion.

3. The DEQ promptly sends the EPA a copy of the application.

4. Within 10 days of its receipt of the application, the EPA forwards the application to the Corps of Engineers,

---

**10.** This is the district from which the Cromwell, Minnesota § 404 permit was issued. *See* Part X.E., *infra.*

**11.** This is the first mention the Court can find in any Corps of Engineers publication as to peat mining.

**12.** The details of State law are not relevant unless otherwise noted.

the U.S. Fish and Wildlife and the U.S. Forestry Service.

    a. These agencies must advise the EPA of their desire to comment on the application within 15 days of their receipt of the application.

    b. If these agencies desire to comment, they must submit their comments to the EPA within 50 days of their receipt of the application.

5. Within 30 days of its receipt of the application, the EPA must indicate to the DEQ in writing whether it will comment on the application.

    a. If the EPA declines to comment, the DEQ may issue a permit after the close of the public comment period upon (1) reviewing the application for compliance with designated environmental criteria, and (2) considering all the comments received. The DEQ's determinations regarding each application must be in writing and the basis must be outlined.

6. Within 90 days of its receipt of the application, the EPA must provide its written comments and make objections to the permit request.

    a. If the EPA timely objects, the DEQ is not to issue the proposed permit unless it modifies the permit in accordance with the EPA's comments.

    b. If the DEQ does not satisfy the EPA's objections or deny the permit, authority to process the permit is transferred to the Corps of Engineers. *See* 44 C.F.R. Pt. 233.

    c. In cases where the EPA objects to the issuance of a permit, within 90 days after the objections by the EPA and after discussions with the Director of the DEQ, the EPA may withdraw its objections and a final permit decision may issue.

    d. If the EPA's objections are not timely, the DEQ may not issue a permit, but must forward the application to the Corps.

## VII. The Trial

### A. Overview

The trial extended over eight days in March, June, and July 2001. Testimony and exhibits covered the history of Michigan Peat and its predecessor's peat mining activities in Minden North including land acquisition, initial mining activities such as land clearing, construction of drainage ditches and haul roads, characteristics of a peat bog generally and the Minden Bog in particular, the effect of peat mining on the ecology of a peat bog, restoration and reclamation methods generally, including the costs of such methods and in particular, the lack of such activity by Michigan Peat and its predecessor, the regulatory process including the permitting process for the Cromwell, Minnesota peat mining activity conducted by Michigan Peat, the physical and environmental condition of the 950 acres currently being mined by Michigan Peat, as well as the economic benefit to Michigan Peat in operating without permit.

Also, proofs were taken relevant to whether or not the Minden Bog and particularly the 950 acres are "adjacent" to the waters of the United States, a jurisdictional necessity for regulation under the CWA. *See SWANCC*, 531 U.S. 159, 121 S.Ct. 675 (2001). As to this issue, the Court, in the *Corrected Memorandum And Order Granting In Part And Denying In Part Plaintiff's Motion For Summary Judgment filed March 21, 1990* at p. 11–13 found "adjacency." However, because the decision in *SWANCC* came later, the Court allowed Michigan Peat to make an evidentiary record on the issue.

### B. Witnesses

#### 1.

The government called eleven witnesses in its case-in-chief, as well as one witness by affidavit and one witness in rebuttal. The government witnesses were:

— Barbara Madsen, an expert in the ecology and values of a peat bog. Dr. Madsen testified as to the impact of peat mining on the Minden Bog, as well as the link between the Black River Drain which is adjacent to the 950 acres, the Black River and Lake Huron (the adjacency issue).

— Norman C. Famous an expert in peat lands restoration. Professor Famous testified as to the impact of peat mining on the Minden bog and restoration options appropriate to the 950 acres as they presently exist and in the future.

— Marcia Spencer–Famous an expert in peat lands restoration. Dr. Spencer–Famous testified as to impact of peat mining on the Minden Bog and the restoration options appropriate to the 950 acres as they presently exist and in the future with an emphasis on restoration to the original wetlands functions in whole or in part.

— Harold Nilsson, a peat lands hydrogeologist. Dr. Nilsson testified as to the implementation costs of EPA's recommended restoration options.

— Russ Money, a wetlands ecologist in the United Kingdom. Dr. Money testified as to his review of the restoration proposals suggested by the other experts and peat lands restoration projects in the United Kingdom and Europe.

— David Schulenberg, a senior enforcement officer for EPA. Mr. Schulenberg testified as to his observations of the field windrows on the 950 acres.

— Allan Batka, a senior enforcement officer for EPA. Mr. Batka testified on his 1997 inspection of the 950 acres and EPA Water Enforcement Division records on the 950 acres.

— Michael Bitondo, a DEQ permit official. Mr. Bitondo testified regarding Michigan Peat's NPDES permit application for peat bog drainage water from the drainage ditch network on the 950 acres.

— Steven E. Spencer, a DEQ supervisor. Mr. Spencer testified that in 1989 he observed a drainage ditch on the southern boundary of the 950 acres which are not present in a 1978 aerial photograph.

— Charlotte Resseguie, an EPA accountant. Ms. Resseguie testified as to the economic benefit to Michigan Peat on operating without a NPDES permit and a 404 permit.

— Timothy W. Peterson, a Corps of Engineers manager in the St. Paul District. Mr. Peterson testified as to permitting activities in the St. Paul District, including emphasis on restoration of peat lands once mining is completed.

— Bruce E. Holbrook, an engineer in the Detroit District of the Corps of Engineers. Mr. Holbrook testified in rebuttal on the relationship of the Minden Bog to the headwaters of the Black River Drain.

— Julie E. Jordan, a Minnesota Department of Environment employee. Ms. Jordan testified by affidavit as to peat mining permit activity in Minnesota.

Much of the testimony was cumulative and a good deal of it could have been the subject of a fact stipulation. Additionally, some of the testimony, while historically interesting, was of arguable relevance to the real issues in the case. Of significance, however, is the fact that *no* representative from EPA or DEQ testified as to any environmental harm from the discharge of bog water through the drainage

ditches into the Black River, or any substantive harm to the environment from Michigan Peat's peat mining as such (in contrast to Michigan Peat's failure to do anything about the mined portions of the 950 acres). Typically, in an environmental enforcement action, regulatory officials testify as to the substantive harm which causes the agency to seek an injunction and why penalties are appropriate for causing such harm. This case is anything but typical.

2.

Michigan Peat called nine witnesses. They were:

— David Newman, chief executive officer of Michigan Peat. Mr. Newman joined Michigan Peat in 1988. He testified as to Michigan Peat's mining activities, the nature of peat mining, the history of peat mining on the 950 acres and Michigan Peat's permit efforts in Michigan and in Minnesota.

— Harry Fraser, director of operations of Michigan Peat. Mr. Fraser joined Michigan Peat in 1985. He testified as to the layout of the 950 acres,[13] the start of the 404 permitting process, maintenance and use of haul roads, drainage ditches and windrows and Michigan Peat's obligations under the NPDES permit. Mr. Fraser had no good explanation of the rather primitive efforts to date of Michigan Peat in restoring mined parts of the 950 acres.

— Gary Danemiller, a senior engineer with Soils And Materials Engineers. This company was retained by Michigan Peat in 1996 to assist in processing a NPDES permit. Mr. Dannemiller described the drainage patterns on the 950 acres and the efforts relating to obtaining the NPDES permit.

— Thomas J. Malterer, an expert in peat lands. Mr. Malterer testified as to appropriate reclamation techniques for the 950 acres. He began his investigative work in 1998. He also testified on the "adjacency" issue.

— Francois Quinty, an expert on peat lands. Mr. Quinty testified as to appropriate reclamation techniques for mined peat land developed in Canada. He began his investigation in 2000.

— Robert Furhman, an economic analyst. Mr. Furhman testified in response to Ms. Resseguie's analysis of the economic benefit to Michigan Peat in peat mining without a permit.

— John Lamb, an employee of McDowell & Associates, a company which does soil and ground water investigation. In 1993 Mr. Lamb conducted a hydrogeological study of Minden North relative to the ground water level impact resulting from the drainage ditches. He also expressed opinions on the Famous' reports.

— Brooks Williamson, owner of Brooks Williamson & Associates, Inc., an environment consulting company specializing in wetlands and lakes and streams projects. The company was retained by Michigan peat in 1993 to assist in the preparation of the application for the 404 permit and has been involved with Michigan Peat since that time in doing site assessments and reclamation technique reports.

— Bernard Goode, a former engineer for regulatory matters with the Corps of Engineers. Mr. Goode testified that the 950 acres was not in the headwaters of the Black River and neither a tributary of or adjacent to navigable waters.

---

**13.** The 950 acres are laid out in approximately 30 acre plots called cells. A layout of the cells is displayed in Exhibit D.

The testimony of the Michigan Peat's witnesses described in detail its efforts to obtain the NPDES permit and the § 404 permit, took issue with what they considered EPA's expansive and innovative views on appropriate reclamation/restoration techniques for mined peat lands and challenged the view that Minden Bog was "adjacent" to the waters of the United States. While the testimony offered by Michigan Peat was not cumulative, again much of it could have been the subject of a fact stipulation.

### C. The Exhibits

#### 1.

The record was inundated with exhibits. EPA put over 280 exhibits into evidence; Michigan Peat put 169 exhibits into evidence. The exhibits included EPA and Corps of Engineers regulations, brochures and the like relating to permit applications, court filings, depositions, resumes and narrative statements of the witnesses, expert witness reports, affidavits, answers to interrogatories, documents relating to land acquisition, the complete permitting history of Michigan Peat's initial 1991 § 404 application and the 1994 application, correspondence, memorabilia, E–Mail messages, permits, historical maps, financial data, photographs, videos, drawings, sketches, excerpts from learned treatises and a host of miscellaneous papers, etc.

Additionally, each party furnished the Court a glossary of terms and the EPA lodged with the Court compilations of cases and proceedings in which penalties were assessed for NPDES violations and a compilation of judicial penalties awarded for violations involving discharges without a § 404 permit. The compilations, while requested by the Court, in retrospect were not helpful. None of the facts in the cited cases remotely resemble the facts of this case. The NPDES violations related to discharges of pollutants which were harmful, i.e. exceeded appropriate limits unlike the circumstances here and the § 404 violations were for harmful discharges without a permit as distinguished from Michigan Peat's continuation of a commercially acceptable operation while a permit application was pending but failing to actively take steps to do anything about mined peat lands.

### VIII. Michigan Peat's Operations In The Minden Bog

#### A. Land Acquisition

The land owned or leased by Michigan Peat in Minden Bog is displayed on Exhibit A. Michigan Peat's predecessor acquired most of the land in a trade with the State of Michigan in 1958, 1,280 acres, for the stated purpose of mining peat. The predecessor purchased an additional 240 acres in April 1958. Michigan Peat leased these acres from its predecessor in 1964. Michigan Peat purchased an additional 480 acres in 1969. These 2,000 acres constitute what is called Minden North.

Between 1975 and 1978, Michigan Peat purchased 814 additional acres south of Minden North. These 814 acres constitute what is called Minden South. As can be seen from Exhibit A, Minden North and Minden South are not contiguous.

#### B. Peat Mining Activity

#### 1.

Michigan Peat's predecessor began mining peat in Minden North in the late 1950's with the clearing of land, digging of ditches, and construction of roads.[14] While the precise extension of peat mining activities over the 951 acres on which peat mining is

---

**14.** There is no dispute that most of the "damage" to a peat bog caused by peat mining occurs in the initial stages of preparation for mining, i.e. landclearing, ditch digging and road construction.

now taking place is not clear, it appears that

— the majority of the drainage ditches were dug prior to 1972 with additional ditches dug in 1975 (western site) and 1976 (along the west side). All ditches were open, in any event, by 1986

— road construction prior to 1972 was confined to the northeasterly portion, with additional roads constructed in the center portion between 1975–1977 and small additional segments in 197–1977, 1979–1980, 1983–1985 and 1986–1987. All of the roads were constructed by 1987. A layout of the progress of road construction is displayed on Exhibit E.

— vegetation was cleared prior to 1972 in the northeasterly portion, in 1975 in the middle running north and south, in 1977 west of the portion cleared in 1975, along the westerly side in 1978–1979, a small portion in 1984 and a strip along the western side in 1985. All of the vegetation was cleared, in any event, by 1985.

In short, the haul roads were installed, for the most part, prior to 1977 with some construction between 1977 and 1985 and a short extension in 1986–1987. All of the ditches were dug by 1976, with some work done on the western ditch and southern ditch in the late 1970's or early 1980's, although EPA argues one ditch was dug in 1986. All of the land was cleared prior to 1982, except for the 95 acres in 1989. In sum, the ditches were dug, the haul roads constructed, and the land cleared in Minden North by 1989 and most of the cells were open by 1985.

### 2.

Generally, peat mining involves the removal of peat moss by first clearing surface vegetation in a bog area and allowing the exposed peat to dry in the sun. Once dried, the peat moss is harvested and bagged, to be sold for horticultural purposes. Michigan Peat harvests three types of commercial peat. Sphagnum peat constitutes the upper most layer of the peat deposit. The second two layers are known commercially as horticultural peat and reed/sedge peat. *See* Exhibit F (depicting a typical cross section of Minden Bog).

After the surface vegetation is cleared from an area being harvested, sphagnum peat is harvested by discing the area with a farming disc, and then vacuuming the loosened sphagnum peat with a vacuum harvester and depositing it at the side of a field into a temporary harvest windrow. Horticultural peat and reed-sedge peat are harvested by using a bulldozer to push the next layers of peat material across the field into temporary harvest windrows.

The temporary harvest windrows measure as much as 30 feet wide, 12–14 feet tall, and several hundred feet long. Their foundation is comprised of woody surface vegetation cleared from intended harvesting areas of the bog using a brush hog mower, a machine comparable to a "very large lawnmower." The peat material is stored in the temporary harvest windrows before being transported by truck to the packaging plant along adjacent haul roads.

### 3.

Michigan Peat constructed haul roads using materials found in the bog. The woody surface vegetation from the bog was used as a foundation for the harvest windrows as well as a foundation for the haul roads. The foundation for the haul roads was topped with sand, gravel, and clay, and then smoothed. The haul roads measure approximately 36 to 42 inches in height, *i.e.* 18 inches of vegetation topped by 18–24 inches of clay and sand. The haul roads are maintained on an as needed basis by using materials from the bog to fill in holds that develop in the road surface and to smooth washboard areas. According to Michigan Peat, the haul roads

are temporary, though none have been removed to date and there appear to be no plans for further removal.

Michigan Peat also excavated a network of in-field drainage ditches to lower the water table in an area of the bog to be harvested to enable the peat to dry in the sun. The ditches reach depths of up to 14 feet. In excavating the ditches, Bay–Houston used backhoes, excavators and Dondi ditching machines [15] to dig into the peat and clay layers of the bog.

The excavated peat and clay were deposited onto the side of the ditches. The excavated peat was later spread into other areas of the bog for future harvest and the excavated clay was used to build the haul roads. Michigan Peat maintains the ditches by removing any fallen plant material or peat, placing it alongside the ditch, and then spreading it into the bog.

### 4.

Inexplicably, until requested by the Court following post-trial briefing, there was nothing in the record particularly describing the acreage differentiation of the 950 acres as displayed in Exhibit G. This exhibit shows that:

— mined prior to 1995—749 acres

— mined subsequent to 1980—202 acres

— currently mined—sphagnum—299.9 acres

— currently mined—reed/sedge—248.5 acres

— never mined—101.4 acres

— depleted—peat, if any, insufficient to warrant mining—181 acres

— restricted either by agreement in 1999 or by Court—100.6 acres

— processing plant and other—156 acres

---

**15.** Dondi machines rotate a series of bucket blades on a large wheel. As the blade rotates, each bucket excavates. A ditch is created as the machine crawls forward. The excavated

As far as the Court can determine, the acreage which cannot be reclaimed but only restored is the 181 mined out. The balance of the acreage is, at least, theoretically available for restoration.

## IX. Penalty Decision on the NPDES (§ 402) Permit

### A. Chronology

The trial record relating to Michigan Peat's application for an NPDES permit for the 950 acres and the issuance of a permit which followed, does not support the imposition of a civil penalty for peat mining without such a permit.

Section 402 of the CWA became law on October 18, 1972. Almost immediately, the State of Michigan, through the DNR was authorized to administer the § 402 program in Michigan and issue NPDES permits. See 39 C.F.R. § 260.61. As described in detail above, the NPDES program administered by the DNR includes enforcement authority and provides for judicial review of denial of a permit. Section 402 gives EPA the right to disapprove any permit proposed to be issued by the State.

Initially Michigan Peat applied for and received a General Permit for Storm Water Drainage Associated With Industrial Activity on September 12, 1994. Dx 153. The details of the general permit program were not described at trial and are not important. Precisely why Michigan Peat did not apply for a permit under § 402 before 1994 is not clear. The letter transmitting the application reads in part:

These documents and the attached check are in response to your letter of August 1, 1994, and subsequent discussions with your department concerning the need for coverage, with a permit, for

---

material is transferred from the buckets to the side of the ditch through the use of a "trough with an auger type mechanism."

Storm Water Discharges associated with industrial activity at our Minden Bog.

There is nothing in the record to suggest that either the DNR or EPA had any concerns over the lack of a NPDES permit by Michigan Peat prior to September 12, 1994. Each agency knew of Michigan Peat's operations and certainly knew there was no NPDES permit outstanding. The application form for the Storm Drainage Permit included a provision stating:

> The Michigan Department of Natural Resources may deny coverage under this general permit and require submittal of USEPA application forms 2 and 2F for an individual permit . . .

A Certificate of Coverage was issued by the DNR to Michigan Peat on December 15, 1994. Dx 5. While there is some dispute over whether this certificate was intended to cover only storm water drainage from the plant site as distinguished from the 950 acres overall, again this is of no relevance. What is relevant is that the DNR was fully aware of water drainage from the 950 acres into the Black River Drain. Moreover, Exhibit M to the application contains a property description of the total acreage owned by Michigan Peat in Minden Bog.

On February 8, 1995, the DNR advised Michigan Peat it needed an individual NPDES permit for its peat mining activities. Px 404. On May 10, 1995, Michigan Peat submitted an application to DNR for a permit, Px 135, noting in the letter of transmittal:

> Enclosed are the completed applications for NPDES process waste water discharge permits pertaining to Michigan Peat Division's peat de-watering facilities located in Sanilac county. It is the position of Michigan Peat that such permits are not needed because the Company's peat harvesting facilities do not produce waste or waste water as defined in the applicable statute or regulation.

However, reserving all rights and defenses, and in an effort to cooperate and clarify matters, Michigan Peat is herewith applying for the NPDES industrial/commercial permit.

On January 26, 1996, the DEQ published a public notice of the application, Dx 165. EPA received a copy of the notice. No comments were received by the DEQ. Thereafter, Michigan Peat and DEQ discussed the details of the permit to be issued, particularly with regard to the effluent limitations appropriate. Dx 150 and 151 (letters from Michigan Peat to DEQ). These discussions continued in 1997. Dx 152. In June 1997, the DEQ held-up processing of the application as a consequence of the pending EPA enforcement action. Px 94, 95, and 96 (internal E–Mail communications of DEQ). On January 22, 1998, Michigan Peat expressed concern about the delay in the process. Dx 468. On June 12, 1998, DEQ, moving forward on the application, asked for additional information from Michigan Peat. Dx 148. On July 2, 1998, Michigan Peat responded and submitted an amended permit application. Dx 167. The amended application limited the outfall locations to two in contrast to the initial application which called for six outfall locations. The permit issued on July 24, 1998. Dx 6.

B. Discussion

1.

At no time from the initial filing of the application for the NPDES permit on March 10, 1995, to the issuance of the permit on July 24, 1998, did EPA involve itself in any way in the permitting process until it issued the compliance order on February 9, 1998. Px 50. The complaint in this case was filed on June 29, 1998, some 14 days prior to the issuance of the permit.

There is no good reason for the Court to involve itself in the contending positions of the parties regarding the need for an NPDES permit for peat mining activities on the 950 acres. Even accepting EPA's position that

— Michigan Peat violated § 402 by failing to obtain an NPDES permit until July 1998

— Michigan Peat collected and conveyed acid "peat bog drainage water," which means it added a pollutant, to the waters of the United States

— the storm water exemption was not applicable

no penalty is in order under the circumstances. These violations were at best technical and there is no evidence of substantive injury to the environment.

Moreover, the administration of the NPDES program including enforcement is the primary responsibility of the State of Michigan. The State of Michigan was fully aware that Michigan Peat did not have an individual NPDES permit. EPA was fully aware that Michigan Peat did not have an individual NPDES permit.

Promptly on being advised of the need for an individual NPDES permit for its peat mining activity, Michigan Peat, made application for a permit and proceeded diligently proceeded to obtain a permit. While the peat bog drainage water constitutes a pollutant, such pollutant is the natural result of a legitimate commercial activity and at no time did any discharge exceed appropriate effluent limitations for such activity. *See* Narrative Testimony of Gary Danemiller at p. 2–3.

### 2.

Applying the factors listed in § 1319:[16]

— the lack of an NPDES permit in the circumstances here was not a serious violation. The discharge was the consequences of an activity that preceded the effective date of the CWA and was well known to the regulatory authorities

— there is no evidence that Michigan Peat gained any economic advantage from the lack of a permit

— Michigan Peat has no history of any substantive 402 violations

— Michigan Peat made a good faith effort to comply with the applicable requirements once advised of the need for an NPDES permit.

— the interests of justice do not warrant a penalty.

### 3.

Additionally, EPA's "take over" of the NPDES affecting Michigan Peat's mining activities is simply not understandable. The effort by EPA in urging a case for a substantial penalty because of the lack of an NPDES permit in these circumstances has no merit. Under 28 U.S.C. § 2462, the Court is limited to considering Michigan Peat's lack of an NPDES permit to the five years following July 24, 1993. Some six months prior, on January 4, 1993, DNR wrote Michigan Peat that it needed an "extensive environmental assessment" in order for it to approve Michigan Peat's § 404 application. Certainly in its investigation of Michigan Peat's activities on the 950 acres, the DNR could see the drainage ditches and the discharge of bog water into the Black River Drain. The fact that Michigan Peat had not been issued an NPDES permit under § 402 was not a secret. There was no surreptitious dump-

---

**16.** In assessing a civil penalty, the Court considers such factors as "the nature, circumstances, extent and gravity of the violation, or violations, and, with respect to the violator, ability to pay, any prior history of such viola- tions, the degree of culpability, economic benefit or savings (if any) resulting from the violation, and such other matters as justice may require." 33 U.S.C.A. § 1319(g)(3).

ing and the drainage water flowing into the Black River Drain, which although it technically contained pollutants, was not in any way injurious to the waters of the United States.

## C. Case law

The § 402 cases cited by EPA as precedent in support of its claim for a civil penalty against Michigan Peat for mining peat without an NPDES permit present circumstances not remotely analogous to the record here. For instance, in *In the Matter of Mahoning Valley Sanitary District*, No. CWA–AO–08–09, 1996 WL 316511 (May 14, 1996), the EPA assessed a civil penalty of $24,300 against a municipal facility for the discharge of lime sludge into navigable waters without a NPDES permit. Although there was a finding that no harm to human health or the environment had been established at the facility, the failure to obtain a permit could not totally be excused.

In *Weber v. Trinity Meadows Raceway*, 1996 WL 477049 (N.D.Tex. June 20, 1996) (unpublished), a private enforcement action, a civil penalty of $230,000 was assessed against the operator of a horse race track for discharging pollutants in the form of equine and other waste emanating from barns which were a contributing factor to the degradation of a portion of a river adjacent to the race track.

In *United States v. Municipal Authority of Union Township*, 929 F.Supp. 800 (M.D.Pa.1996), a dairy plant exceeded permit limitations in the discharge of equipment rinsing product spills and sewage into municipal treatment works. A four million dollar penalty was assessed because of "lengthy delay in meaningfully confronting ... permit violations and ... unwillingness to reduce production volume under [the] waste water problem was under control". *Id.* at 808.

In *United States v. Sheyenne Tooling & Manufacturing Co., Inc.*, 952 F.Supp. 1420 (D.N.D.1996), defendant emptied individual waste through a sewage treatment plant which discharged its treated waste into a river. The discharges exceeded effluent limitations to which the plant was subject. The Court found the cause of violation was inadequate advise to management and that the plant received a benefit because of the violation. The penalty assessed was $60,000.

In *United States v. Gulf Park Water Co. Inc.*, 14 F.Supp.2d 854 (S.D.Miss.1998), the Court found no adverse harm but that the violations of the CWA were serious since they represented a significant threat to human life and the environment and occurred over a period of 12 years. The defendant enjoyed an economic benefit in not having to connect up a private sewer system to a municipal system of some $600,000. A penalty of $1.5 million dollars was assessed against an individual ($450,000) and a corporation ($1,050,000).

In *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109 (4th Cir.1988), a private action, a civil penalty of $977,000 ($1,000 per day of violation) was upheld against a paper company for failing to file the quarterly report required by its NPDES permit. The actual injury stemming from reporting and sampling violations, coupled with the threatened injury stemming from the failure to report on maximum levels of harmful effluent establish[ed] injury traceable to [defendant's] actions "*Id.* at 1113."

Finally, in *United States v. Allegheny Ludlum Corp.*, 187 F.Supp.2d 426 (W.D.Pa.2002), a case recently cited by EPA, the district court assessed a civil penalty of $8,244,670 for violations resulting from the operation of five steel plants. The evidence at trial showed the defendant had dumped wastewater into two Pennsylvania rivers in violation of the CWA. Although the government was unable to

show actual harm to the rivers, the district court found "persuasive evidence that [defendant's] violations likely caused harm to the river." Indeed, the government's expert testified that defendant had discharged toxic pollutants, specifically toxic metals, which are harmful in parts per billion; defendant discharged on eight occasions in parts per million. Defendant also spilled oil, one such instance resulting in a spill that reached over 30 miles, which defendant reported as a "small quantity of water containing oil" being discharged.

What is common to each of the cases discussed above is first, some form of actual injury was shown, and second, the violation was in some respect willful. Here, in contrast, a permit application was pending and the permitting authorities were aware of the activity and third, there was no showing that applicable effluent limitations had been exceeded.

For all of these reasons, the Court has found that no civil penalty is warranted regarding the lack of an NPDES permit.

## X. Penalty Decision on the § 404 Permit

As with the § 402 permit, in order to properly assess the merits of EPA's request for a civil penalty because Michigan Peat operated a commercial peat mining activity without a § 404 permit, it is appropriate to consider Michigan Peat's efforts to obtain a permit.

### A. The 1991 Application

Michigan Peat first applied for a § 404 Permit on July 26, 1991 following discussion with the DNR. Dx 2. The application covered all of Minden North and Minden South (2800 acres) and included a summary of production plans for 1991–1996 and a series of 8-1/2″ × 11″ drawings depicting proposed production activity for these years. It contained statements as follows:

4. *Project Information*

Describe Proposed Activity
Response:
Clearing acreage of surface vegetation, preparing the peat moss surface for solar drying by discing, and removal of the dried peat moss surface for storage in windrows prior to screening and bagging for horticultural peat moss-based products.

5. State why you believe the project will not cause pollution, impair or destroy the water or any natural resource.
Response:
Michigan Peat Company production involves the removal of peat moss. Water drainage from the production acreage is controlled by a system of ditches. The production methods do not cause any pollution to the surrounding environment or impair or destroy the water quality or other natural resources through extraction of the peat moss.

Item # 4: Support facilities.
As new areas are brought into production haul roads will be constructed to bring peat from the bog to the processing area. The roads will be built using clay backfill to a depth of 1 foot above grade. The clay will be recovered when the roads are no longer required.
The amount of fill required will be 17,000 cubic yards.

Item # 5: Reclamation plans.
The bog area removed from production will have a reed sedge base covering the clay soil. The amount of peat will vary according to conditions, such as the total depth of peat and the drainage.
Michigan Peat Company's current position will be to allow the areas removed from production return to the

natural state. As more area is removed over time Michigan Peat Co. may endeavor to find an alternate use for the land, if economically viable and endorsed by the appropriate permitting authorities.

The application said nothing about restricting mining depth or plugging ditches.

On August 29, 1991, the DNR requested additional information to "complete the application" including reclamation plans for areas taken out of production. Px 18. The DNR closed the file on October 2, 1991 to give Michigan Peat time to compile the requested information. Px 19. On June 4, 1992, Michigan Peat submitted additional information. Px 20. No additional information relating to reclamation was included.

On June 17, 1992, presumably because the application was now complete, the DNR published a public notice of the application. Px 21. The notice stated in part:

Michigan Peat Company/Bay Houston Towing Company, 7385 Polk Road, Minden City, Michigan 48456, has applied to this office for a permit under the Goemaere–Anderson Wetland Protection Act (1979, PA 203) to enlarge an existing 850 acre commercial peat harvesting operation. This will involve clearing surface vegetation from an additional 700 acres of leatherleaf bog, excavating drainage ditches directed to the Black River County Drain, and removing peat to an approximate depth of 10 feet. An estimated 1,972,390 cubic yards of peat will be removed from the entire 1,550 acre area over a 5 year period. The project will also require the placement of approximately 17,000 cubic yards of clay in the bog to construct temporary haul roads, to be removed following completion of the project. This project is located at T1AN, R14E, Sections 20, 21, 28, 29, and 33 in Minden Township;

and T13N, Section 4 in Wheatland Township, Sanilac County, Michigan.

.  .  .  .  .

This application will be reviewed by federal agencies in accordance with an agreement with the U.S. Environmental Protection Agency, under provisions of Section 404 of the Federal Clean Water Act Amendments of 1977.

The Corps of Engineers advised EPA on July 21, 1992, that the permit application should be denied because it was deficient in failing to include an alternative analysis of use, among other things. Px 23. On August 17, 1992, the Corps of Engineers, following a site visit, advised EPA of its concerns, among other things, over the appropriate form mitigation should take. Px 24. On August 25, 1992, Michigan Peat requested that "Due to the complicated nature of the study for the permit" the application file be temporarily closed. Px 26. On September 3, 1992, the Fish And Wildlife Service expressed its concerns to EPA over the scope of the proposed peat operation expansion. Px 25. A copy of the letter to EPA was sent to the DNR. Also, on August 12, 1992, representatives of the Corps of Engineers, EPA and the Fish And Wildlife Service visited Michigan Peat's peat mining operations. Dx 47, Deposition of Louise Clemency, at pp. 40–55.

Absent from the record during this time period is any communication from any of the federal agencies to Michigan Peat or any statement by either the Corps of Engineers or EPA that Michigan Peat should cease peat mining pending approval of its application or that it should change in any way its current methods of peat mining.

### B. The 1994 Application

On September 19, 1994, Michigan Peat filed a new application to mine peat from the 2,800 acres owned in Minden North and Minden South. Dx 2. The application

was filed by Brooks Williamson & Associates, Inc., an environmental consulting firm, and contained a detailed discussion of Michigan Peat's proposed activities. The application did not deal with ditches and haul roads separately. The application was accompanied by a comprehensive Environment Site Assessment in a separate document. Px 4. As to reclamation, the application stated:

RECLAMATION

Reclamation of the harvested wetland is proposed once operations are complete. Reclamation of the wetland areas is intended to be an on-going process conducted concurrently with and dictated by the phasing and market demand of the harvest operations. Once the harvest operation within a field or fields has been completed, reclamation can proceed within that area.

Reclamation will involve removal of the haul roads that separate the fields. The timing of this work is dependent on the need of certain haul roads for continued access to other fields not yet harvested. As work within an area is completed, and use of the haul road is no longer required, the clay and brush material used to construct the road are to be removed as well as the peat underneath. The clay and brush will be re-used for new road construction. The intent is to remove the majority of the roads except those that will be left for permanent site access.

All harvested areas will remain in a saturated or inundated condition at the surface, except for slopes from adjacent undisturbed areas. This will create an optimal environment for reclamation through natural re-vegetation of the area (Figure 17). Desired wetland vegetation will be able to seed in from surrounding areas carried by natural forces of wind and water as well s wildlife. It is expected that significant numbers and species of wildlife will be at-tracted t the reclaimed areas because these areas will provide attractive habitat types not presently found within the general area. This process will build upon itself as increased wildlife influx brings with it increased sources for re-vegetation. This approach has worked previously on portions of this site and at other similar sites where harvesting has already been completed. In some areas of the site the natural re-vegetation has attracted a variety of ducks, other water fowl, shorebirds, and numerous other species of animal and plant life.

On September 30, 1994, the DNR published notice of the application. Px 31. The notice stated in part:

Michigan Peat Division, P.O. Box 980129, Houston, Texas 77098, has applied to this office for a permit under the Inland Lakes and Streams Act (1972, P.A. 346, as amended) *to continue* an *existing peat removal operation impacting* approximately 850 acres of bog wetland; *and to expand peat removal during a 40 year* period over an additional 1,969 acres of bog, thereby impacting a total of 2,819 acres of bog wetland located on two parcels of land adjacent to the Minden City State Game Area. This operation could involve: (1) removal of approximately 35.5 million cubic yards of peat from 2,819 acres of bog to a typical depth of 10 feet, with the temporary exception of a 600 foot buffer strip adjacent to state-owned natural areas; (2) temporary stockpiling of peat adjacent to haul roads; (3) excavation and stockpiling of approximately 160,000 cubic yards of clay from 14.7 acres of the bog wetlands, and subsequent placement of his material within the bog to form haul roads; (4) excavation of a system of drainage ditches needed to de-water the peat, varying in depth from 2 to 8 feet, to discharge to three existing perimeter ditches which in turn discharge to the

Black River Drain; and (5) construction of two sedimentation basis, one on each of the two sites, each facility to consist of a pear of basins 300 feet by 80 feet by 8 feet deep. The applicant also proposes reclamation of the site following peat removal. An Environmental Site Assessment for the project is on file and may be reviewed at this office. This project is located at T14N, R14E, Sections 20, 21, 28, 29, and 33, Minden Township, and T13N, 14E, Section 4, Wheatland Township, Sanilac County, Michigan.

On October 6, 1994, EPA advised the DNR it intended to comment on the application. Px 32. On October 10, 1994, EPA commented internally on that application, Dx 130, Vol. I, attachment A, noting that "Peat mining is clearly dependent on the availability of peat, which exists only where wetland conditions exist or have existed" and that it concurs with the issuance of a permit if the following conditions are met:

> 1) the applicant minimizes impacts to those areas that can be reasonably utilized during the term of the permit (usually five years), 2) the applicant submits a proposal to mitigate for the proposed impacts, including loss of an irreplaceable ecosystem type and temporal loss of a very significant number of wetland areas, and 3) the applicant submits a reclamation plan for the abandoned excavation areas.

EPA formalized its comments on the application in a letter to the DNR on December 23, 1994, Px 33, by requesting additional information as required by the 404(b)(1) guidelines including Alternative Analysis and Minimization and Compensatory Mitigation, explaining under each heading what was required.

In March 1995, Brooks & Williamson submitted the following documents to the DNR: a Reclamation Demonstration Plan, Px 184; A Reclamation Plan, Px 186; and an Analysis of Alternative, Px 183.

The Reclamation Plan stated (at p. 2):

> At the time the Goemaere–Anderson Wetland Protection Act (1979 P.A. 203) was enacted, the majority of the areas currently active or depleted were already under active harvest. These areas are, therefore, grandfathered prior to the act and do not fall under the jurisdiction of the MDNR and do not require reclamation. For this reason, these areas are not being considered for use in the reclamation plans for other harvest areas which do fall under the Department's jurisdiction.

This is the first reference in the record to "grandfathered" acreage. At oral argument on January 17, 2002, Michigan Peat represented to the Court that the "grandfathered acreage" was first mentioned at the public hearing on the application by a DNR representative and that this exclusion was carried forward in the processing of the permit application.

On March 21, 1995, EPA advised DNR that it was withdrawing its objection to the 1994 application for the permit and said, in part, as follows, Px 34:

> Over the last 90 days, we have been coordinating with MDNR staff in an effort to address [our] concerns. Our discussions have resulted in a proposal by MDNR which is described in a draft permit and decision document dated March 21, 1995. The permit would restrict peat mining to previously disturbed areas in the northern parcel and would ensure that additional losses of wetlands in the Minden Bog complex are avoided. Moreover, the draft permit would require Michigan Peat to restore approximately 830 acres of mined areas to wetlands as compensatory mitigation.

> The State's draft permit effectively addresses concerns previously raised by

EPA and, on that basis, I am withdrawing our objection in accordance with provisions of 40 CFR 233.50(j), on condition that the final permit not differ materially from this draft. If there are substantive changes to this draft decision by MDNR, we would need to review these changes to determine whether or not they are material to us.

The same day, March 21, 1995, the DNR made Findings of Fact as required by applicable federal regulations. Dx 4. The document summarized the reasons for granting the permit, in part, as follows:

I. Summary and Action Proposed

Minden Bog is a rare and irreplaceable wetland ecosystem which has significant ecological and scientific value. It is located in Sanilac County, where approximately 78 percent of the wetlands which existed prior to European settlement have been lost, along with wetland functions such as flood storage, wildlife habitat, and groundwater recharge. Currently, the Minden Bog includes about 4000 acres on State and private land, of which about 3200 acres exists in a natural and undisturbed condition.

Michigan Peat Division of the Bay–Houston Towing Company controls approximately 2819 acres or 70 percent of the bog, from which they have been extracting peat since the mid 1950's. About 1280 acres of this property were obtained in 1958 land exchange with the State of Michigan. The company has extracted a significant amount of peat from that parcel over a period of more than 30 years.

The Department has determined that some 749 acres of the Minden Bog were brought into production prior to the effective date of the Goemaere–Anderson Wetland Protection Act, and that these areas are therefore outside the jurisdiction of this Act. Michigan Peat may continue to utilize these areas.

In addition, Michigan Peat has brought approximately 202 acres into production since implementation of the Goemaere–Anderson Wetland Protection Act. Given the fact that this specific area has already been grossly altered, the Department has determined that peat extraction may continue, but only if Michigan Peat Division agrees to comply with provisions which will improve the management of the bog. These include: (1) mitigation for ongoing impacts through eventual reclamation of 830 acres which have been mined; (2) control of the volume of discharges to the Black River by placement of water control structures at outlet points; (3) additional controls on the water quality of the discharge; and (4) partial relocation of the perimeter drainage ditch.

Michigan Peat has also requested authorization to expand peat mining operations, impacting approximately 1,792 acres of currently unmined wetland. The Department has determined that this expansion is not in the public interest, and will therefore deny Michigan Peat's request for expansion. The proposed expansion would result in a loss of public benefits provided by wetlands due to the direct loss of an extremely rare and nonrenewable wetland resource; adverse impacts on the hydrology, chemistry, and ecology of that portion of the Minden Bog which is located on adjacent state lands; loss of habitat, including habitat for species which are at the southern end of their range such as the Lincoln Sparrow; and, potentially, impacts on flood flows and water quality in the Black River—although these impacts could be mitigated to an extent by engineered control structures.

The document went on to describe the Basis And Required Conditions For Authorization Of Existing Peat Extraction

Area and the Basis For Denial Of Request To Expand The Peat Extraction Area.

The DNR at the same time proffered a permit to Michigan Peat limited to the 202 acres in Minden North not "grandfathered" and required reclamation[17] of the 749 acres "grandfathered" as well as the 202 acres covered by the permit. Dx 4. The Permitted Activity was described as follows:

Permitted Activity

Extract peat within a previously disturbed area of approximately 202 acres in size as shown on the attached modified plans dated March 17, 1995. Maximum depth of the mining activity shall not exceed ten feet below the existing surface evaluations. The permit DOES NOT authorize any activities within the unmined areas of the Minden Bog.

Michigan Peat had serious objections to the conditions of the proffered permit particularly to the limited acreage and the requirement that reclamation extend to the "grandfathered" 749 acres. These objections were stated in a letter to the DNR dated April 30, 1995. Px 37.

Again, as with Michigan Peat's 1991 application, notably absent from the record during this time period is any communication from any of the federal agencies to Michigan Peat or any statement by either the Corps of Engineers or EPA that Michigan Peat should cease peat mining pending approval of the § 404 application or that it should change in any way its current method of peat mining.

C.  Activity Subsequent to the Initial Proffer of the § 404 Permit

On May 1, 1995, Michigan Peat filed an administrative appeal under Michigan's Administrative Procedures Act, Mich. Comp. Laws Ann. § 24.201, *et seq.*, asserting that "The Permit dated March 21, 1995 containing requirements that were unobtainable or unnecessarily burdensome and are therefore unacceptable to Michigan Peat." Px 38. The same day, May 1, 1995, Michigan Peat filed a taking action in the Michigan Court of Claims. Px 39, which it amended on June 5, 1995. Px 40. On June 15, 1995, an order was entered in the Court of Claims by stipulation allowing Michigan Peat "to extract peat consistent with past practice from the 202 acres." Px 41.

For some time thereafter, Michigan Peat and DEQ attempted to resolve their differences over the conditions of the proffered permit. DEQ kept EPA advised of the progress being made. EPA did not deal directly with Michigan Peat. On August 26, 1996, DEQ advised EPA of the conditions it proposed for a permit it believed satisfactorily to Michigan Peat. Px 42. EPA responded on October 1, 1996, Px 43, expressing concerns about the conditions. All of the parties met in Chicago in February 1997 to discuss resolution of the matter.[18] On March 25, 1997, DEQ advised Michigan Peat of the alternative possibilities with regard to the dispute, including a "state only" permit, which meant Michigan Peat would have to obtain a "Federal 404 Permit" from the Corps of Engineers. Px 44.

On June 6, 1997, EPA internally laid out the scenario for transferring authority for the permit to the Corps of Engineers under the applicable federal regulations. Px 141. EPA was aware of the acute concerns in DEQ over the taking action in the

---

17.  The reclamation requirements required by the proffered permit are considerably less onerous than those set forth in currently proffered permit of the Corps of Engineers, issued on January 10, 2002.

18.  This is the first direct contact between EPA and Michigan Peat in all the years the § 404 permit application was pending.

Court of Claims and the desire of DEQ to issue a state permit to obviate any claim against the State of Michigan for a taking.[19]

On June 6, 1997, DEQ issued a "state only" permit to Michigan Peat authorizing it to "Extract peat from a 2819 acre site." Px 45. On June 18, 1997, EPA withdrew the authority of DEQ to issue a § 404 permit to Michigan Peat. Px 46. This transferred permitting authority for Michigan Peat's operation to the Corps of Engineers, 40 C.F.R. § 233.50. On June 23, 1997, the Corps of Engineers advised Michigan Peat the DEQ application file had been transferred to it, Px 211, stating:

> The processing of a federal Section 404 permit by the Corps will begin upon the Corps' receipt of a complete application from you. If you require application materials to be sent, please notify us.

On May 16, 1997, Michigan Peat filed the declaratory judgment action, described above. *See* Part III., *supra*. On February 9, 1998, EPA issued the Findings of Violation and Compliance Order. Px 50. The Court dismissed the declaratory judgment action on May 11, 1998. EPA filed the compliant in this case on June 9, 1998.

Michigan Peat did not peat mine during the 1998 summer season. It resumed peat mining in 1999 as described above under the "umbrella" of the Court. *See* Part IV., *supra*.

On December 17, 1998, Michigan Peat, at the urging of the Court and without prejudice to the then pending declaratory judgment action, filed a permit application with the Corps of Engineers. Px 53. On February 26, 1999, the Corps of Engineers published notice of the application. Px 54.

On March 25, 1999, EPA advised the Corps of Engineers of its opposition to the issuance of a permit as proposed by Michigan Peat and requested that no permit be issued until the enforcement action was resolved. Dx 124. On April 19, 1999, Michigan Peat filed a Wetland Reclamation Concept Minden Site document with the Corps of Engineers. Dx 29. On March 5, 2001, EPA submitted a Restoration Plan for Minden North. Dx 107. On January 10, 2002, shortly before final argument, the Corps of Engineers proffered a permit to Michigan Peat.

### D. The Testimony at Trial on the § 404 Issue

For the most part the evidence at trial on the § 404 issue related to EPA expert witnesses opining on appropriate methods of reclaiming the fully mined portions of Minden North and restoration of the portions currently being mined, as well as limitations on the current methods of peat mining being used by Michigan Peat. Michigan Peat's expert witnesses disagreed with EPA witnesses and expressed the opinion that the suggested restoration techniques were unlikely to be effective and entailed costs that would make peat mining uneconomical. The Court, as previously described, *see* Part IV., *supra*, stated at the conclusion of the proofs that it would defer decision on the reclamation/restoration issue until the Corps of Engineers proffered a permit to Michigan Peat.

On reflection, much of the expert testimony of the EPA witnesses reflected use of a shotgun rather than a rifle. The 950 acres currently or previously mined is not all of one kind. Some portions still have a

---

**19.** Apparently, the State of Michigan had recently been the subject of a 90 million dollar judgment in the Court of Claims in a taking action because of its refusal to allow sand mining in the Nordhouse Dunes along the east shore of Lake Michigan, a case which cased some criticism. *See* Sierra Club press release found at www.greatlakes.net/lists/enviro–mich/1997–05/msg.html.

layer of sphagnum peat; other acreage is reed-sedge peat. Still other acreage is fully mined. Until a comprehensive peat mining plan for the future commercial life of Minden Bog is developed, it is speculative and conjectural to discuss restoration/reclamation in detail except as to the acreage which has been fully mined. This hiatus in the record seriously affects the ability of the Court to understand the degree to which Michigan Peat's peat mining at Minden Bog has adversely affected the Minden Bog beyond the impact occasioned by a legitimate commercial activity.

### E. The Cromwell, Minnesota § 404 Permit

Michigan Peat has a § 404 permit, issued by the Corps of Engineers, to mine peat in Cromwell, Minnesota. The circumstances of the issuance of that permit are relevant to an assessment of the conduct of Michigan Peat in Minden North.

Michigan Peat began its Cromwell peat mining in 1967. On September 17, 1993, the Corps of Engineers forwarded a first notice to Michigan Peat requesting that a § 404 application be filed prior to August 25, 1994. Dx 9. On May 25, 1994, the Corps of Engineers sent Michigan Peat a second notice, again requesting a § 404 application by August 25, 1994. These notices, which formed the predicate for Michigan Peat obtaining a permit for Cromwell are set forth in Part VI.C, *supra*.

Upon receipt of this second notice, Michigan Peat, on August 22, 1994, made application to the Corps of Engineers for a § 404 permit, Dx 148, to "harvest peat for horticultural use." On February 22, 1996, the Corps of Engineers issued an Environmental Assessment on the application, Px 189, which stated in part:

> The purpose of the project is to mine peat for commercial sale.

On March 6, 1996, the Corps of Engineers issued a § 404 permit to Michigan Peat, Dx 8:

> to excavate approximately 800 acres of peat mining from Corona Bog for horticultural use

The permit included a requirement for reclamation as described in Michigan Peat's State of Minnesota permit application.

There is nothing in the record about Michigan Peat mining peat without a § 404 permit prior to the issuance of the Corps of Engineers permit on March 6, 1996.

### F. Other § 404 Peat Mining Permits

At the request of the Court, the EPA compiled a list of § 404 permits relating to peat mining. Ct. Ex. 2. The list references seven permits issued by the Corps of Engineers, six of which were issued in the 1990's and one in 1985. The description of the precise nature of the permitting activity varies in the several permits, *i.e.* "discharge," "excavate," "mine peat," "remove overburden," "retaining and maintaining . . . fill,". Also, there is no indication in the several permits of whether or not the permitting activity was new or was ongoing.

The Court also has reviewed five permits issued by the DNR, three of which were issued in the 1990's and two of which were issued in the late 1980's. The permitted terminology in these permits also varies, *i.e.* "Conduct a peat mining operation," "remove . . . material . . . as part of an on-going peat mining operation," "remove . . . peat," "dredge and excavate." Likewise, there is no indication in the several permits, save one, of whether or not the permitted activity was new or ongoing.

### G. Discussion

#### 1.

At no time from the filing of the 1991 application for the § 404 permit to date,

has either the EPA or the Corps of Engineers directly dealt with Michigan Peat regarding the application, permit conditions or the manner in which it mines peat in Minden North except for the effort in February 1997 in Chicago, mentioned above, or under the aegis of the Court.

Between the filing of the 1991 application and the proffer of the 1995 draft permit by the DNR, EPA expressed no dissatisfaction with Michigan Peat's activities in Minden North, except to disagree with its reclamation plans. Indeed, EPA accepted the "grandfathering" of the 749 acres since Michigan Peat would be required to reclaim these acres as a condition obtaining a 404 permit on the 202 acres.

As with the NPDES program, administration of the § 404 program was the primary responsibility of the State of Michigan. EPA expressed no dissatisfaction with the manner in which the State of Michigan was administering the program. Recognizing the concerns DNR had over the taking action in the Court of Claims and its desire to get the State of Michigan out from under the taking claim, while not expressly stated at trial, it appears that EPA withdrew permitting authority for Minden North from DNR and gave it to the Corps of Engineers with the acquiescence of the DNR.

Subsequent events support the conclusion that EPA continued to condone Michigan Peat operating without the § 404 permit. Had Michigan Peat promptly recognized the legitimacy of the withdrawal of State of Michigan authority with regard to the issuance of a § 404 permit and promptly continued pursuing its application with the Corps of Engineers it is unlikely the compliance order would have issued. Indeed, the regulations are ambiguous as to whether Michigan Peat was required to file a new application with the Corps of Engineers. See 40 C.F.R. § 233.53.

At the time the compliance order was issued and this enforcement case filed, Michigan Peat was still taking the position it had a state issued permit and the 749 acres was "grandfathered."

As to the manner in which Michigan Peat pursued the 1991 application and, again the 1994 application, EPA's dissatisfaction with the slowness of the process and the manner in which Michigan Peat responded to the reclamation/restoration requirement is really irrelevant. An applicant is not bound to accept agency conditions for a permit without protest or abjure any effort to modify them. Moreover, except for the mined acres, there is nothing in the record to suggest that the manner in which Michigan Peat mined peat was substantively injurious to the environment. EPA grossly overstates the harm from peat mining in Minden North when it must be recognized that inherent in such activity is "permanent hydrological and chemical changes to the peat land that prevents it from returning to its original state." [20]

Developing appropriate criteria for approving peat mining is no easy task. The conflict among the experts at trial illustrates the difficulties in writing a § 404 permit and that such a permit is not an over-the-counter item.[21] A good deal of

**20.** Wilfred Cwikiel, "Rethinking Peat Mining," National Wetlands Newsletter, Vol. 22 No. 3 (May–June 2000) at p. 5.

**21.** See Barbara J. Madsen, Ph.D and Wilfred Cwikiel, *Development of Criteria for Review of*

*Peat Extraction Proposals in Michigan and Other EPA Region 5 States,* December 1998 (revised February 2000) (a study prepared for the DEQ).

give-and-take is involved. Regretfully, this record seems to suggest both EPA and Michigan Peat failed to recognize that one catches more flies with honey than with vinegar.

2.

Again, applying the factors listed in § 1319:

— the lack of a 404 permit in the circumstances here was not a serious violation. The regulated activity was well known to the authorities and they did nothing to stop it.

— Michigan Peat gained no significant economic advantage from the lack of a permit.

It spent $500,000 on studies in its efforts to satisfy DEQ requirements. Indeed, as a result of its cessation of operations in 1998, Michigan Peat had to eliminate 42 of the 100 jobs at the Minden facility and now has only 50 employees. Michigan Peat's voluntary restrictions on mining since 1999 as a result of this case have prevented the rehiring of those laid off individuals. *See* Trial Transcript Vol. IV, testimony of David Newman, at p. 66.

— Michigan Peat has no history of any substantive violations.

— Michigan Peat's efforts have not reflected bad faith.

— The interests of justice do not warrant a penalty.

3. The § 404 Penalty Cases

Like the § 402 penalty cases, the § 404 cases cited by EPA as precedent in support of its claim for a penalty against Michigan Peat for mining peat without a 404 permit present circumstances not remotely analogous to the record here.

In *U.S. E.P.A. v. Northwoods Organics, Inc.,* Dkt. No. 5–CWA–95–005, (U.S. E.P.A. Region 5, Mar. 24, 1995), the EPA assessed a $63,000 consent penalty against a peat mining business as part of a settlement of an enforcement action directed to stopping the opening of sites on 1,300 acres of wetlands for peat mining without a § 404 permit. While not so stated in the decision, it appears that the defendant enlarged an existing peat mining operation without obtaining a permit.

In *United States v. Feinstein Family Partnership,* Case No. 96–232 (M.D.Fla. 1998), the Court assessed a $400,000 penalty for clearing 24½ acres of wetlands for development of a residential subdivision without a § 404 permit. The proofs showed that the "twenty-four acres of wetlands were previously heavily vegetated" and afterwards "the terrain was flat and water pooled up on the site" ... and that "the damage done to the wetlands was significant."

In *Borden Ranch Partnership v. Corps of Engineers,* 1999 WL 1797329 (E.D.Cal. Nov.8, 1999), the plaintiff deep ripped and plowed wetlands which degraded and destroyed 2 acres as part of a real estate development. The Court found a lack of earnest effort to comply with the CWA. Plaintiff was fined $1,500,000 reduced to $500,000 if certain restoration measures were undertaken.

What is common to each of the cases discussed above is first, an actual injury was shown and second, the violation was willful. Here, by contrast, a permit application was pending, the permitting authorities were fully aware of the activity, and a legitimate commercial activity was involved.

XI. Other Issues

In the *Corrected Memorandum And Order Granting in Part and Denying In Part Plaintiff's Motion for Summary Judgment* of March 21, 2000, discussed above, the Court stated that there was a genuine issue of material fact over the following issues:

— whether the maintenance of field windrows (temporary storage of peat in piles) constitutes a "discharge" or "addition." This was an EPA assertion.

— whether the ditch exception under § 404(f) applies. This was a Michigan Peat assertion.

— whether the temporary road exemption under §§ 404(f)(1)(B) and (E) applies. This was a Michigan Peat assertion.

— whether Bay–Houston's activities prior to 1984 were covered by a NWP 26 permit

Decision on these issues is unnecessary. Notwithstanding the *considerable* effort at trial[22] by EPA to establish that the maintenance of the windrows constituted a "discharge" of a pollutant and hence required a § 404 permit and that the ditch and road exemption did not apply and, therefore, the excavation of the ditches and the maintenance of the roads without a permit constituted a violation under § 309, each of these activities is an *integral* part of peat mining and, indeed, was described by Michigan Peat in its permit application. There is nothing in the CWA or the regulations or in the record, to suggest that a separate § 404 permit is required to maintain windrows or that the excavation of the ditches or construction of the haul roads cannot be regulated as part of the conditions of a § 404 permit.

The same is true in regards to the NWP 26, in effect from 1977 to 1984. The activity that the permit covered, discharges of dredged or fill material into isolated wetland or wetlands adjacent to headwaters, see 42 Fed.Reg. 37122 (July 19, 1977), is also an essential part of the peat mining process. Thus, whether or not Michigan Peat's activities prior to 1984 were covered under NWP 26 is of no real relevance.

## XII. Conclusion

### A. Overview

This Decision deals only with the claim of EPA for assessment of a monetary penalty against Michigan Peat for mining peat in the Minden Bog without a NPDES permit from 1972 to July 24, 1998 and without a § 404 permit from 1972 to date. EPA acknowledges that because of the five year statute of limitations imposed by 28 U.S.C. § 2462, only Michigan Peat's acts for the five years preceding July 24, 1998 to the date the complaint was filed can be formally considered. It is for these activities that EPA asks the Court to impose a three million dollar penalty.

### B. The EPA's Position on Penalties

In its opening statement EPA summarized its position as follows:

> With regard to Section 402, Michigan Peat should be penalized for its long-time failure to report its effluent discharges to the State as required by federal law.

> [With regard to Section 404] The government believes this penalty is warranted based on the quantity of pollutants that Michigan Peat has discharged. The evidence shows that Michigan Peat's operation involves the removal and discharge of billions of tons of peat from Minden Bog.

These statements are seriously flawed.

As to § 402, EPA is really saying that Michigan Peat should be penalized for a *per se* failure to file NPDES reports during a period when an application for a

---

**22.** EPA's post-trial proposed Memorandum And Order filed October 10, 2001, devotes 28 fact paragraphs to Ditching (¶ 66–93), 20 fact paragraphs to Haul Roads (¶ 94–113), and 22 fact paragraphs to Field Windrows (¶ 138– 159), as well as 53 separate conclusions of law (¶ 54–106) as to the exceptions for ditches and roads and 18 separate conclusions of law (¶ 8–25) as to field windrows.

NPDES permit was pending. No request was made for such reports, and, had they been filed they would have reported acceptable limits of effluents.

As to § 404, EPA is saying that Michigan Peat should be penalized for mining peat during a period when an application for a § 404 permit was pending, no request was made to close down, and had the request been made and rejected, no court would likely have granted an injunction against Michigan Peat continuing mining peat.

EPA, in closing argument, on its claim for a penalty for operating without a § 402 permit simply reiterated its opening argument claims.

EPA, in closing argument, on its claim for operating without a 404 permit said:

[Michigan Peat] displayed a chronic and deliberate indifference to and desire to avoid serious reclamation requirements that were established by both state and federal authorities. . . . case involves massive quantities of discharges committed by this company for decades, hundreds of acres of high-quality wetlands being destroyed in the process, the draining of offsite wetlands owned by the State of Michigan, and an indifference by the company to take responsible measures to deal with it. . . . The intentional decision to avoid complying with the requirements of 404 for a permit and the intentional decision to avoid coming up with a plan that regulators asked for is a substantive violation of 404 in and of itself and we believe has had serious direct consequences for the state of the Minden Bog as it's found today. In response to these acts, we believe that it's important to send a signal both to the company and to other regulated parties that similar conduct is unacceptable, and a $3 million penalty in light of all of the circumstances is warranted.

This statement is also seriously flawed.

### C. Findings

Michigan Peat, from the filing of the 1991 application for a § 404 permit forward, never wavered in its effort to obtain a § 404 permit. The effort to validate the draft permit proffered by the DNR in 1995 was misguided. Nevertheless, it should not be penalized for putting forth a flawed legal theory. Also, its disagreement with the permitting authorities over the appropriate reclamation/restoration techniques, was not frivolous. The issue of reclamation versus restoration was a changing target in the 1990's.

As to the "massive quantities of discharge," this says no more than they mined a great deal of peat. "Hundreds of acres of high-quality wetlands" were not destroyed. By 1991, 134 acres were fully mined and post 1991, 174 acres were fully mined—and with the full knowledge of the permitting authorities. Nothing in the record supports the "intentional decision to avoid" assertion. Disagreement with a regulatory demand is not an "avoidance," particularly in the circumstances here.

As also previously stated, the fact that at no time did either the DNR or EPA advise Michigan Peat to close down, suggest modification in its peat mining activities, or seek a court order to close down its operations. Given the fact that no governing agency attempted to in any way alter or stop Michigan Peat's activity during the application process, Michigan Peat should not be penalized for its activities, particularly where the DNR and EPA were fully aware of such activities.

As to the § 1319 factors, the EPA appears to focus on the number and duration of the violations, to the exclusion of the other factors. EPA also seems to suggest that where a particularly rare ecosystem is involved, like the Minden Bog, there should be a more stringent set of conditions attached to a § 404 permit. The

CWA does not support such a position. And as noted above, consideration of the statutory factors as a whole supports a finding that no penalty is warranted in this case.

Lastly, assessing a penalty in this case is tantamount to saying to Michigan Peat and to other regulated parties: If you disagree with a regulator's demands in good faith you can be penalized if the disagreement comes to court and the judge finds the regulators have the better of the case.

### D. Final Observations

The world of the § 404 permit as displayed in the record here is an Alice–in–Wonderland world. Initially, the State of Michigan processes and issues the permit. EPA can comment and its consent is required before a permit can issue. However, the applicant deals only with the State of Michigan. EPA can withdraw the State of Michigan's authority if dissatisfied with the State of Michigan's draft permit. The applicant has nothing to say on withdrawal. The Corps of Engineers then becomes the permitting authority with EPA having veto power. Again, the applicant deals only with the Corps of Engineers. Obtaining a § 404 permit is not a straightforward proposition—it requires a good deal of negotiation in the course of processing the application and the regulatory framework leaves much to be desired.

What happened here was a breakdown in communication caused in part by the manner in which EPA plays its role in the regulatory process and in larger part by the failure of Michigan Peat to recognize that the State of Michigan was not the final arbiter of permit conditions.[23] Also at play were these additional factors:

— Michigan Peat owns or leases 2,800 acres in Minden Bog useable for mining peat

— Michigan Peat wants to return mined areas to a wetland state containing large areas of open water while EPA is insistent on significantly more. This difference not only reduces the volume of peat available for mining but likely makes mining peat a more expensive activity.

---

**23.** The Court has not ignored the rather eclectic events making up the history of this case, which are due in part to the fact that the DNR the Corps of Engineers and EPA all at one time have had a role in the Michigan Peat's efforts to obtain a permit. When the EPA withdrew the DNR's permitting authority, Michigan Peat's application was transferred to the Corps of Engineers. The regulations are somewhat ambiguous as to whether an applicant must submit a new application to the Corps of Engineers in such circumstance, or if its application is merely transferred and the Corps of Engineers is to continue processing the application. Then, EPA filed the enforcement action against Michigan Peat. Thereafter, Michigan Peat, at the Court's urging, applied to the Corps of Engineers for a permit. At the time, the Court anticipated that the Corps of Engineers would move forward on the application in the regular course. However, the Corps of Engineers suspended processing of Michigan Peat's application, apparently under 33 C.F.R. 326.3(e)(1)(iv), which although gives the Corps of Engineers the authority to suspend processing of an application, the regulation is not absolute: the Corps of Engineers may continue processing an application if it is "clearly appropriate." Moreover, the Court also anticipated that the Corps of Engineers would proceed independent of the EPA. This did not happen; it appears EPA was involved at some level in the processing of Michigan's Peat's application before the Corps of Engineers. Then, shortly before final arguments, for reasons unknown, the Corps of engineers issued a proffered permit to Michigan Peat. Why the EPA withdrew the DNR's permitting authority, then filed this case when it did seeking millions in penalties but never once sought injunctive relief, and why the Corps of Engineers suspended and then resumed processing of Michigan's Peat's application is not clear.

What EPA offered the Court is a revisionist history of what occurred. Taking EPA's position at face value, Michigan Peat should have ceased mining peat with the enactment of the CWA. This clearly would not have been appropriate. With the enactment of CWA, habits of dealing with the environment had to change. Permits are now required for activity that was previously permit free. Regulations on the mining peat came slowly. The State does not seem to have been particularly enthusiastic about its role. EPA knew this. When Michigan Peat, the State, and EPA got up to speed, serious differences emerged—differences yet to be resolved. The fact that no penalty has been assessed has nothing to do with the issues of restoration or reclamation.

Hopefully, with the penalty phase of the enforcement effort by EPA at an end, the conditions under which Michigan Peat can continue its historic commercial activity in the Minden Bog will be resolved and the Court has seen the last of the parties. Time will tell.